BEAVER MEADOWS, a partnership; Donald B. Weixelman; Diane Weixelman; O.J. Harvey; Mary Christine Harvey; Charles B. McKibben; Louise S. DiLuzio; Ronald H. Fox; Roberta M. Fox; Allen Zohn; Ruth Zohn; Ronald Lee Sell; Joann Sell; Christopher J. Cannon; Becky J. Cannon; Steven W. Hanson; Marilyn M. Hanson; Rosemary Simone; Robert Simone; Vernon L. Rider; William Melvin Dewar II; Pat D. Boyd; Shirley J. Boyd; Gerald Wayne Moore; James E. Moore; Donald Giaque; Dorothy Giaque; E.H. Barker; Patricia R. Barker; Kenneth W. Ronkainen; Helen Ronkainen; Kenneth E. Cline; Jean F. Cline; Terry R. Minton; Claudia Minton; Gary L. Vance; Erick W. Weiss; Richard Bivens; Adrianna Bivens; Kenneth L. Barker; W. Sam Rogers; Kenneth E. Cline, Jr.; Steven E. Cline; Peggy E. Cline; H. Buckhorn Estates, Inc.; Orville Hawkins; and Shirley Hawkins, Plaintiffs-Appellants,

v.

The BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF LARIMER, STATE OF COLORADO; Courtlyn W. Hotchkiss; Nona Thayer; James D. Lloyd; and the County of Larimer, State of Colorado, Defendants-Appellees.

No. 83SA313.

Supreme Court of Colorado,
En Banc.

Dec. 2, 1985.

Calkins, Kramer, Grimshaw & Harring, Susan E. Burch, Charles E. Norton, Denver, for plaintiffs-appellants.

Harden, Schmidt & Hass, P.C., George H. Hass, Fort Collins, for defendants-appellees.

LOHR, Justice.

Appellant Beaver Meadows is a partnership that proposes to create a planned unit development (PUD), to be known as Beaver Meadows, in western Larimer County, Colorado. The additional appellants (landowners) are other owners of property in that prospective development. The appellants seek reversal of a district court order that upheld two requirements imposed on the developer by appellee Larimer County Board of County Commissioners (Board) as conditions of approval of the master plan for the Beaver Meadows PUD. These requirements were that the developer provide for the improvement of a 4.73 mile off-site access road and for emergency medical services. Pursuant to C.R.C.P. 106(a)(4), the district court reviewed the Board's findings and resolution, and held that the Board had acted within its jurisdiction and had not abused its discretion. Because we find that the county's regulations are insufficient to authorize either of the two conditions imposed by the Board, we reverse the judgment of the district court.

## I.

A master plan of the proposed PUD was submitted by Beaver Meadows to the

Board in 1980, after having been recommended for approval, subject to certain conditions, by the Larimer County Planning Commission.[1] The plan was discussed at public hearings on February 2 and February 4, 1981. Following the February 4 hearing, the Board voted to approve the PUD plan subject to several specified conditions. Beaver Meadows and the landowners brought an action for review in Larimer County District Court pursuant to C.R.C.P. 106(a)(4), asserting that the Board lacked jurisdiction, abused its discretion, or both, in imposing certain of the conditions. The district court concluded that Beaver Meadows had not been accorded due process of law during the hearing process. In the court's view, the Board had not allowed Beaver Meadows adequate opportunity to address certain of the Board's concerns after those concerns became identified in the course of the hearings. The district court remanded the matter for further consideration.

Following the remand order, the appellants and the Board's staff met to arrange a new hearing before the Board. The appellants also supplied the Board's staff with information tending to rebut the Board's original findings. By the time a hearing was held, on March 4, 1982, only two major issues remained to be resolved: (1) the Board's requirement that the developer improve County Road 73C (Creedmore Lakes Road), a gravel road[2] 4.73 miles long that provides access to the proposed Beaver Meadows PUD, and (2) the Board's requirement that the developer arrange emergency medical services for the PUD. The March 4 hearing did not resolve these issues, and the Board held a further hearing on April 29, 1982. On June 16, 1982, the Board issued revised findings and a resolution.

The resolution conditioned approval of the Beaver Meadows master plan on the improvement of Creedmore Lakes Road. In the findings, the Board concluded that the development would have a significant adverse impact on the road in terms of safety hazards and dust pollution. The Board conceded that the road eventually would be improved by the county but noted that the Beaver Meadows PUD should not be developed until safe access is available. After stating its findings, the Board resolved that:

> The 4.73 miles of Creedmore Lakes Road from its intersection with County Road 74E to the entrance of the proposed development shall be paved to the minimum standards as required by the Larimer County Engineering Department.... Upon presentation by the applicant to the County of the necessary pre-engineering data to the satisfaction of the County Engineer, the County shall pursue formation of, and hold a public hearing on, a local improvement district which shall, if approved, construct the improvements to the above standards. Upon holding a hearing for such district, the Larimer County Commissioners may or may not approve a resolution ordering the improvements, depending upon evidence produced at the hearing relative to ordering the improvements.

The resolution further provided that the improvement district envisioned by the Board would be formed only if it was supported by the majority of area property owners and residents, and that the resolution providing for the district would be null and void if the district were not formed and financed within eighteen months. Beaver Meadows could not begin development of the PUD until the district was formed and the financing was guaranteed. However, the resolution also provided the developer with two alternative methods of improving the road if the improvement district concept failed. Under the first alternative,

---

1. The application of Beaver Meadows also contained a request for rezoning. The rezoning decision is at issue in this litigation only in that rezoning was approved "subject to the condition that a planned unit development master plan ... be submitted and approved."

2. The trial court described the road as a gravel road. In the record it is sometimes referred to as a gravel road and at other times as partly gravel, partly dirt.

Beaver Meadows could construct the improvements in phases, completing in each phase a percentage of the road improvements corresponding to the percentage of the total lots then existing in the PUD. The second alternative would require Beaver Meadows to pay a "per living unit fee" to the county to cover the cost of the road construction. In that case, at the end of five years the total unpaid amount would be due, regardless of how many lots ultimately were platted or how many living units ultimately were approved.

The Board's resolution also conditioned approval of the Beaver Meadows master plan on action by the developer to assure the availability of emergency medical services, as follows:

> The developer shall insure that adequate provision is made for emergency services for this development, including maintenance of the existing private telephone line at Beaver Meadows to be available for emergency purposes and provision for emergency medical services by entering into a written agreement with the Red Feather Emergency Response Team to remain in effect until such time as such services are available from any other entity acceptable to the Larimer County Health Department. Said signed agreement shall be provided to the County for review and approval along with the submittal of preliminary phase plans.

Dissatisfied with the road improvement and emergency medical services conditions, Beaver Meadows and the landowners filed an amended complaint in Larimer County District Court, again alleging that the Board had exceeded its jurisdiction and abused its discretion in imposing the conditions. Beaver Meadows took the position in its amended complaint that it should pay an equitable share of the expense of road improvements but should not bear the entire cost. This was consistent with the position maintained by Beaver Meadows throughout the proceedings before the Board. The district court entered an order on May 2, 1983, addressing the two controverted conditions individually.

The court concluded that since the Board had the authority to "make reasonable regulations in regard to the public health, safety, and welfare, especially when dealing with a large development of this nature in the remote mountain county [sic] of western Larimer County," it was within the authority of the Board to require the developer to submit an emergency medical services proposal. The court, however, deleted from the resolution the requirement that Beaver Meadows obtain a signed contract for emergency medical services, and replaced it with a requirement that the developer submit an acceptable proposal for such services.

On the issue of the required improvements for Creedmore Lakes Road, Beaver Meadows argued that it was unfair for the county to impose the entire cost of the road improvements on one development when many existing residences and subdivisions also used the access road and would benefit if it were resurfaced. The Board countered that the PUD would have a significant impact on the road, which was already inadequate to meet the needs of the existing developments. The court found that the Board, as the trier of fact, had determined that use of the road posed substantial air pollution and safety concerns such that improvement of the road would be required even if it were to be used only by the Beaver Meadows PUD. The court determined that there was evidence in the record to support the Board's finding despite contrary evidence submitted by Beaver Meadows. In addition, the court held that the Board's action did not exceed its jurisdiction, abuse its discretion, or take property of the appellants without due process of law.

Addressing the apparent injustice of placing the road improvement burden entirely on the developer of one PUD, the court noted that the Board had suggested alternative solutions to the developer, that the developer was free to submit its own compromise proposals, and that Beaver Meadows would still have the option of postponing construction of the PUD until

the road was improved by some other entity. It was the court's view that the Board had not required that Beaver Meadows perform the road construction; it merely had denied Beaver Meadows the right to develop the PUD until such time as adequate access should exist.

In this appeal, Beaver Meadows and the landowners contend that the Board had no authority to condition approval of the PUD master plan on the improvement of a county road or the provision of emergency medical services; that the Board acted arbitrarily and capriciously and abused its discretion in imposing the conditions; that by imposing the contested conditions on the developer, the Board arbitrarily placed a burden on a private party that should have been apportioned among all parties benefiting therefrom; that the Board's bad faith was evident from its failure to adhere to the schedule for comments by the developer agreed upon following the district court's remand; and that the imposition of these conditions violated both the United States Constitution and the Colorado Constitution by taking the appellants' property without due process of law.[3] The Board denies the appellants' contentions.[4] Because we conclude that the Board acted without authority in imposing the emergen-

cy medical services condition and the road improvement condition, we do not reach the constitutional challenges raised by the appellants. For the same reason, it is unnecessary to address the appellants' other arguments for reversal of the district court's judgment.

## II.

Counties are political subdivisions of the state and have only such powers as are granted to them by the Colorado Constitution or delegated to them by the general assembly. *Pennobscot, Inc. v. Board of County Commissioners*, 642 P.2d 915, 918 (Colo.1982); *Colorado State Board of Social Services v. Billings*, 175 Colo. 380, 384, 487 P.2d 1110, 1112 (1971); *Board of County Commissioners v. Love*, 172 Colo. 121, 125, 470 P.2d 861, 862 (1970). A delegation of power operates to confer all implied powers reasonably necessary to the proper exercise of the expressly delegated power. *Pennobscot, Inc. v. Board of County Commissioners*, 642 P.2d at 918; *Board of County Commissioners v. Love*, 172 Colo. at 125, 470 P.2d at 862.

In the area of subdivision regulation and, more particularly, PUD regulation, counties derive their regulatory authority from

---

**3.** In addition, Beaver Meadows argues that the Board, in the final resolution, improperly altered two requirements previously agreed upon by the county and the developer. The first purported alteration relates to the point in the PUD approval process at which the developer must provide the necessary collateral guaranteeing completion of certain required improvements. The second alteration concerns a provision in the original resolution (issued prior to the remand from the district court) requiring a "subdivision improvements agreement" which was to include those improvements in an area of the PUD designated as "Tourist" that are "essential to the Master Plan." In the final resolution, the Board added that whether a particular improvement is "essential to the Master Plan" will be decided by the county staff. We will not discuss this issue further except to note that even if these "additions" are in fact additional and contrary to what was contemplated by the parties or provided for by regulation, nothing in the record establishes that the Board and Beaver Meadows reached a binding settlement agreement on any matters that precluded the Board from exercising its normal, indepen-

dent decisionmaking powers as they relate to these issues. However, to the extent that Beaver Meadows did not have an opportunity to present evidence or comment upon certain matters, based upon a mistaken but good-faith assumption that those issues were conclusively determined in all respects by agreement, fairness dictates that the developer be allowed to address these issues on remand.

**4.** The Board also argues that the appeal should be dismissed because the appellants filed an untimely notice of appeal. The appellants filed their notice of appeal outside of the normal time period after the district court, acting pursuant to C.A.R. 4(a) as it then existed, granted the appellants' motion for an extension of time because the appellants demonstrated that excusable neglect on their part resulted in their failure to file a timely notice. After reviewing the circumstances surrounding the untimely filing, we conclude that the district court did not abuse its discretion in granting the motion for an extension of time and permitting the late filing of the notice of appeal.

several statutory provisions. Section 30–28–133, 12 C.R.S. (1977 & 1985 Supp.), provides for the creation of a county planning commission for each county and directs the board of county commissioners to adopt and enforce subdivision regulations. This section and section 30–28–133.1, 12 C.R.S. (1985 Supp.), also identify information that must be submitted by a developer to accompany a subdivision proposal, and the general requirements for subdivision approval. The authority to promulgate subdivision regulations is in addition to the general authority given to counties to adopt a master plan, zoning plans and zoning regulations. *See* §§ 30–28–106 to –109, –111 to –116, 12 C.R.S. (1978 & 1985 Supp.). Finally, the Planned Unit Development Act of 1972, sections 24–67–101 to –108, 10 C.R.S. (1982), provides for the adoption of standards and conditions by which a PUD shall be evaluated. §§ 24–67–104, –105, 10 C.R.S. (1982). PUD regulations adopted by a county may differ from those applicable under general zoning and subdivision regulations as long as the PUD requirements substantially comply with the subdivision provisions of part 1 of article 28 of title 30 C.R.S. §§ 24–67–105(7), –107(4), 10 C.R.S. (1982).

Pursuant to these grants of authority from the state legislature, Larimer County adopted and published a Comprehensive Plan. That plan included among its several components a set of Goals and Objectives, a Policy Plan and a Land Use Plan. The county also adopted a Subdivision Resolution and a Planned Unit Development Resolution. Evaluation of the validity of the Board's actions in this case therefore requires analysis of the state enabling statutes and Larimer County's land use regulations. We will analyze these provisions as they are applicable to the requirements at issue in this case, considering first the road improvement condition and, thereafter, the emergency medical services condition.

## A.

The Board's revised resolution of June 16, 1982, creates a primary method and two alternative methods for financing the improvement of Creedmore Lakes Road. The financing scheme provides no assurance that Beaver Meadows will not be required to bear the full cost of the improvements as a condition to PUD development. In fact, the two alternatives are merely proposals that would allow Beaver Meadows to pay for the improvements over time, rather than in a lump sum.

The primary proposal requires Beaver Meadows to submit to the county "pre-engineering data to the satisfaction of the County Engineer" concerning the paving of Creedmore Lakes Road to the minimum standards of the county engineering department. The resolution states that on presentation of this information the county will hold a hearing on the formation of a local improvement district to construct the improvements. However, the resolution also provides:

> Upon holding a hearing for such district, the Larimer County Commissioners may or may not approve a resolution ordering the improvements, depending upon evidence produced at the hearing relative to ordering the improvements.

Thus, the county retains the unrestricted power to decide whether a local improvement district ultimately will be formed. If the district is not formed and financing of the improvements is not guaranteed under one of the two approved alternative methods, Beaver Meadows would not be permitted to proceed with development. As a result of all of the provisions of the resolution pertaining to Creedmore Lakes Road, the county retains the power to condition approval of the Beaver Meadows PUD on the developer's financing of the road improvements. We must determine whether the applicable statutes and regulations support this purported exercise of power by the Board.

■ The state enabling statutes particularly relevant to this action by the Board begin with part 1 of article 28 of title 30, 12 C.R.S. (1977 & 1985 Supp.), which contains the general statutory authority for county planning and zoning. First, a county is

authorized to adopt a master plan for the physical development of the unincorporated territory of the county. §§ 30–28–106 to –109, 12 C.R.S. (1977 & 1985 Supp.). Section 30–28–106(3)(a), 12 C.R.S. (1985 Supp.), provides that the master plan (also known as a comprehensive plan) may include provisions for "[t]he general location, character, and extent of streets or roads" and "the acceptance, widening, removal, extension, relocation, narrowing, vacation, abandonment, or change of use of any of the foregoing public ways." Section 30–28–107, 12 C.R.S. (1985 Supp.), further provides, in relevant part:

> The county or regional master plan shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted, and harmonious development of the county or region which, in accordance with present and future needs and resources, will best promote the health, safety, morals, order, convenience, prosperity, or general welfare of the inhabitants, as well as efficiency and economy in the process of development, including such distribution of population and of the uses of land for ... [certain specified purposes] as will tend to create conditions favorable to health, safety, energy conservation, transportation, prosperity, civic activities, and recreational, educational, and cultural opportunities....

■ Next, the county commissioners are authorized to adopt zoning plans and zoning regulations to guide· the use and development of land within the unincorporated territory of the county. §§ 30–28–111 to –116, 12 C.R.S. (1977 & 1985 Supp.).

> Such regulations shall be designed and enacted for the purpose of promoting the health, safety, morals, convenience, order, prosperity, or welfare of the present and future inhabitants of the state, including lessening the congestion in the streets or roads or reducing the waste of excessive amounts of roads, ... securing safety from fire, floodwaters, and other dangers, ... [and] securing economy in governmental expenditures....

§ 30–28–115(1), 12 C.R.S. (1985 Supp.).

Section 30–28–133, 12 C.R.S. (1977 & 1985 Supp.), then requires the counties of this state to adopt subdivision regulations to complement any planning and zoning requirements that may be adopted. Such subdivision regulations shall require subdividers to provide, among other data, a plat and other documentation showing the layout or plan of development and including information showing the "[e]stimated construction cost and proposed method of financing of the streets and related facilities ... and such other utilities as may be required of the developer by the county." § 30–28–133(3)(c)(VII), 12 C.R.S. (1977). Furthermore, no person may submit an application for subdivision approval unless the subdivision plat or plan provides, "pursuant to section 43–2–147, C.R.S., that all lots and parcels created by the subdivision will have access to the state highway system in conformance with the state highway access code." § 30–28–133.1, 12 C.R.S. (1985 Supp.).

Completing the group of relevant statutes, the general assembly adopted the Planned Unit Development Act of 1972 to supplement the general zoning and subdivision authority. § 24–67–101 to –108, 10 C.R.S. (1982). "In order that the public health, safety, integrity, and general welfare" may be furthered, counties are authorized to approve PUDs for the following purposes, among others:

> (e) To encourage a more efficient use of land and of public services, or private services in lieu thereof, and to reflect changes in the technology of land development so that resulting economies may enure to the benefit of those who need homes;
>
> (f) To lessen the burden of traffic on streets and highways;
>
> ....

§ 24–67–102, 10 C.R.S. (1982). A PUD "plan" as defined in section 24–67–103(2), 10 C.R.S. (1982), may include provisions relating to the "intensity of use or density of development" and "private and public streets, ways, roads, ... and other public facilities." A county is authorized to ap-

prove, disapprove, or conditionally approve PUD applications, § 24–67–104(1)(e), 10 C.R.S. (1982), but a county's PUD regulations must require that a finding be made by the county when approving a PUD that the plan "is in general conformity with any master plan or comprehensive plan for the county," § 24–67–104(1)(f), 10 C.R.S. (1982). County regulations governing PUD applications and review also must cover additional specified subject matter outlined in section 24–67–105, 10 C.R.S. (1982), and must be in substantial compliance with the provisions relating to subdivisions provided in part 1 of article 28 of title 30, 12 C.R.S. (1977 & 1985 Supp.), and any related regulations promulgated by the county. § 24–67–107(4), 10 C.R.S. (1982).

Read together, the master plan, zoning, subdivision and PUD enabling statutes constitute a broad delegation of authority generally encompassing the subject of road planning and development. We recognize that none of these provisions specifically and expressly authorizes a county to condition approval of a PUD application upon the developer's improvement of the public roads providing access to the PUD. *Compare* §§ 30–28–133(4)(a), (11), 12 C.R.S. (1977 & 1985 Supp.) (authorizing a county to adopt subdivision regulations that require dedication of land for schools or parks or payment of fees in lieu of dedication and that require developers to contribute to the cost of drainage facilities). We believe, however, that it would defy reason to conclude that the legislature intended that a PUD application should be reviewed without taking into account the adequacy of access roads to assure the health and safety of persons traveling to and from the development and the conformity of such roads with the comprehensive plan.

■ To hold that the county should engage in PUD review oblivious to these critical public concerns would be to ignore the pervasively expressed legislative intent that counties plan, zone and regulate to provide a safe and efficient network of roadways, as reflected in the planning, zoning, subdivision and PUD statutes. We are persuaded by the language of these statutes that the general assembly has authorized each county to consider the impact of any proposed development on the county's transportation network as a whole. The statutory scheme envisions that, in proper circumstances, a county may require that a developer contribute to the improvement of roads as necessary to provide safe, efficient access to a proposed development as a condition of PUD approval. Because the legislative intent to authorize such a requirement is amply demonstrated, our interpretation of the statutes is fully consistent with the requirement that statutes delegating subdivision approval authority to counties must be strictly construed. *Pennobscot, Inc. v. Board of County Commissioners,* 642 P.2d at 919; *Board of County Commissioners v. Pfeifer,* 190 Colo. 275, 278, 546 P.2d 946, 947 (1976).

A determination that the state has authorized the counties to consider the adequacy of access in evaluating a PUD application, however, does not end our inquiry. We must now determine whether the county has exercised the statutory authority by enactment of regulations sufficiently specific to empower the Board to impose the condition for access road improvements at issue in this case. This inquiry requires consideration of the statutes and county regulations in combination. We conclude that, while the statutes and regulations are sufficiently definite to reflect the intention that the Board consider adequacy of access in evaluating a PUD application, the regulations lack the detail necessary to implement that intent and to support the condition imposed by the Board in this case.

■ It is within the police power of the state to impose on a developer the burden of providing reasonable improvements to public facilities made necessary by a development as a condition of approval of that development. *See Bethlehem Evangelical Lutheran Church v. City of Lakewood,* 626 P.2d 668, 671–74 (Colo. 1981); *King's Mill Homeowners Ass'n, Inc. v. City of Westminster,* 192 Colo. 305, 311–12, 557 P.2d 1186, 1191 (1976). The

state may delegate such authority to its political subdivisions. *See Pennobscot, Inc. v. Board of County Commissioners,* 642 P.2d at 918. A delegation of authority is not invalid simply because its terms are broad and general, *Cimarron Corp. v. Board of County Commissioners,* 193 Colo. 164, 168, 563 P.2d 946, 949 (1977); *cf. Cottrell v. City & County of Denver,* 636 P.2d 703, 708–09 (Colo.1981) (standards for legislative delegations to administrative agencies), although there must be sufficient standards and procedural safeguards involved in the delegation and subsequent implementation to ensure that any action taken by a county in response to a land use proposal will be rational and consistent and that judicial review of that action will be available and effective, *cf. id.* at 709.[5]

■ These delegation principles will be satisfied in a case of this type if the general standards and requirements for county land use planning and control outlined in the state statutes and encompassing the relevant subject matter, when *coupled with* the procedural protections in the state statutes *and with* the regulations at the county level, are sufficiently detailed to provide all users and potential users of land with notice of the particular standards and requirements imposed by the county for PUD approval. Our earlier review of the state enabling statutes demonstrates that, while they are fully adequate to authorize a county to adopt regulations for PUD approval that would require a developer to provide assurance of adequate access roads to serve the proposed development as a condition to that approval, they are too general to serve as an independent-

ly sufficient authority for such a requirement. The question then becomes whether the county regulations are sufficiently specific to supply the requisite supplementary authority. To resolve this question, we now review the county regulations.

The appellants argue that the Larimer County regulations concern only on-site road development, not access roads outside the PUD. We disagree. First, one of the general requirements for reviewing and approving any PUD is that "[t]he street system must be integrated with the existing network of streets or public rights-of-way," in this case, Creedmore Lakes Road. Larimer County Planned Unit Development Resolution, § IV(C)(1)(a). Further general considerations for evaluating and approving a proposed residential PUD are the "effect upon [the] transportation network, transit facilities and traffic densities," Larimer County Planned Unit Development Resolution, § VI(D)(4), and the "[e]ffect upon, and from, land use, form and character of adjacent development," Larimer County Planned Unit Development Resolution, § VI(D)(3). As part of its final decision, the Board may impose requirements to ensure that the PUD, as developed, will "not result in undue traffic congestion or traffic hazards" and "not create significant water, air, or noise pollution." Larimer County Planned Unit Development Resolution, § VIII(G)(4), (6). Moreover, the PUD proposal must satisfy the requirements of Larimer County's Comprehensive Plan. Larimer County Planned Unit Development Resolution, §§ II(F), VI(D)(8), VIII(C)(3)(d). That requirement is also imposed by section 24–67–104(1)(f), 10 C.R.S. (1982).[6]

5. We recognize the differences between political subdivisions of the state, such as counties, and administrative agencies in the executive branch, and do not hold here that the validity of legislative delegations to political subdivisions must in all cases be measured by the same standards as are applicable to legislative delegations to administrative agencies. However, the considerations we found compelling in *Cottrell,* 636 P.2d at 708–09, also are present in this case, and they persuade us that we should employ the same standard of review.

6. We recognize that in *Theobald v. Board of County Commissioners,* 644 P.2d 942 (Colo. 1982), we held, in the context of a review of a zoning resolution, that a master plan "is only one source of comprehensive planning, and is generally held to be advisory only" and is not necessarily binding upon the zoning discretion of the legislative body. *Id.* at 949. However, in this case, the general assembly, and Larimer County, have *required* that a PUD plan *must be* in general conformity with the county's master plan or comprehensive plan. § 24–67–104(1)(f), 10 C.R.S. (1982); Larimer County Planned Unit

One element of the Larimer County Comprehensive Plan is the Policy Plan. Key Concept II of the Policy Plan provides:

The public has a large investment in utilities, roads, schools and other necessary services. Protection of this investment requires that new development pay for any increased use of these services which results from the new development. New residents shall be made aware of the existing services and realize that they are responsible for upgrading the roads, utilities, etc. when it becomes necessary.

Policy II A of the Policy Plan further provides:

New development should be located and designed for compatibility with both existing land uses and those previously approved by the Board of County Commissioners, in terms of health and safety considerations; aesthetics; air, water or noise pollution; safe and convenient access; efficient movement of goods and people; operational efficiency; maintenance costs; provision of services and property value.

Policy IX, entitled "Transportation," contains the following pertinent requirements:

A. Any significant addition to the existing transportation network should be based upon close coordination with local, regional, state and federal agencies and the land use implications of such an addition should be analyzed and weighed in the decision process.

B. Transportation systems, including roads, airports and railroads, should be located and designed to maximize their utility and safety.

. . . .

E. New development should be located and designed to provide for efficient transportation facilities, to help meet the transportation needs of the development and of off-site users and to allow for future road improvement and enlargement.

Policy XII, "Economics," states, in relevant part:

A. New development, to the extent it is measurable and equitable, should pay its own way.

Finally, part XVI of the Action Policies and Programs in the Policy Plan provides:

The county should develop mechanisms for assessing the short and long-term impact of a proposed development on public expenditures and revenues. When applicable, the county should require payments from the applicant, to the extent it is fair and equitable, to upgrade a given county service or facility.

The various requirements in the regulations and Comprehensive Plan as described above are all applicable in the review of a proposed PUD under the proper circumstances. We conclude that these regulations, while not a model of specificity, are sufficiently detailed to reflect an intent that the Board consider the adequacy of off-site roads to provide safe, efficient access to a proposed PUD in the course of review of a PUD application.

The regulations, however, are insufficiently specific to provide the necessary criteria to accomplish such an evaluation. The regulations are devoid of standards by which the adequacy of an access road can be evaluated and remedial measures prescribed. There are no criteria with respect to design considerations such as grades, sight distances, width, shoulders, vertical or horizontal curves, drainage, or types of surfaces. Although the record indicates that engineering standards for county roads exist, it is apparent that Creedmore Lakes Road does not comply with those standards and that the county's proposal for upgrading the road does not contemplate compliance. Rather, the county's engineering department envisions an engineering study followed by a set of design criteria to be determined ad hoc and without controlling standards, except that the paving shall meet minimum county engineering standards. As the record here amply demonstrates, appropriate design for a road to serve a remote mountain development can be the subject of vigorous, honest

Development Regulations, §§ II(F), VI(D)(8);    VIII(C)(3)(d).

disagreement among knowledgeable professionals.

The regulations, furthermore, are silent on permissible dust pollution levels. It is clear from the record that a highly important, if not controlling, consideration in the county's decision to require a paved surface was the perceived problem of dust control.

Moreover, the regulations provide no useful guidance for determining whether the costs of access road improvements should be borne entirely by the developer or whether they should be shared by other property owners who will be benefited. Therefore, of course, the regulations do not address the procedural means by which any such sharing of costs could be accomplished, or the basis for dividing the costs.

The Larimer County Comprehensive Plan does express the general concept that a developer should make equitable contributions to upgrade county facilities where the development causes the need for such improvements. *See* Larimer County Policy Plan, Policy XII A, and Action Policies and Programs, XVI. The record in the present case, however, reflects the inadequacy of such general guidelines to enable a determination to be made of Beaver Meadows' fair share of the cost of road improvements. In addition to the 407 development units proposed for Beaver Meadows, the road passes through and presently serves Crystal Lakes subdivision, which has a total of 2370 lots approved, of which 1702 lots had been platted and 1550 lots had been sold at the time of the hearings. The lower part of the road passes through other private property. Members of the public use the road to obtain access to hunting, fishing, and firewood gathering on the United States Forest Service land beyond Beaver Meadows. A member of the county planning staff testified that the road was inadequate at the time of the hearings to serve the Crystal Lakes development alone. The county regulations contain no criteria by which an equitable apportionment of road improvement costs could be made

among the various parties who would be benefited.

■ As a result of these regulatory deficiencies, the Board was left to evaluate the adequacy of access and to pick and choose among the design and cost-sharing solutions proffered by various witnesses without the benefit of established standards. Therefore, notwithstanding the general delegation of authority by the legislature to consider adequacy of access, the obvious concern of the county regulations about this same subject, and the general policy of the county to require new development to pay its own way and share in the cost of upgrading county facilities to the extent that it is fair and equitable, we conclude that the statutes and regulations, taken in combination, do not authorize imposition of the road improvement condition at issue here. This is because they provide insufficient standards and safeguards to ensure that county action in response to a PUD application will be rational and consistent and that judicial review of that action will be available and effective. *Cf. Cottrell v. City & County of Denver*, 636 P.2d at 709.

### B.

■ The requirement that Beaver Meadows provide a plan for emergency medical services as a condition of PUD approval is neither explicitly authorized by the state statutes nor mentioned in the county's regulations. The Board argues that its general authority to promulgate zoning, subdivision and PUD regulations and to evaluate subdivision and PUD applications with the purpose of promoting the health and safety of the citizenry, when combined with the policies expressed in the Larimer County Policy Plan that developers pay for any increased public services that are necessitated by the new development, authorizes the imposition of the emergency medical services condition in this case. We agree that the statutes would support such action by the county if supplemented by appropriate regulatory criteria. Such regulatory guidance is absent in this case, however, and for that

reason we conclude that the emergency medical services condition was imposed without authorization.

A concern that land development proceed in a manner consistent with public health and safety pervades the statutory scheme. *See, e.g.,* § 30–28–115(1), 12 C.R.S. (1985 Supp.) (zoning regulations to be designed to promote public health and safety); § 24–67–102(1), 10 C.R.S. (1982) (PUD powers granted to further public health and safety). The availability of emergency medical services in populated areas remote from existing medical facilities presents an obvious and important public health and safety concern. Although not addressed with the specificity accorded to the provision of a potable water supply, *see* §§ 30–28–133(3)(d)(V), (6)(a), 12 C.R.S. (1977), or suitable sewage disposal facilities, *see* §§ 30–28–133(3)(c)(VI), (6)(b), 12 C.R.S. (1977), we are satisfied that the general assembly has demonstrated its concern with public health and safety sufficiently so that legislative authorization to counties to consider the adequacy of emergency medical services in evaluating a PUD application can be confidently inferred.[7] This delegation of authority can be given effect in the PUD approval process if coupled with the necessary, detailed regulations.

However, even though the state statutes are broadly sufficient to establish the general authority for the county to impose an emergency medical services condition in the proper situation, Larimer County's regulations do not authorize the imposition of such a condition. These regulations not only lack criteria for evaluating the sufficiency of emergency medical services but are totally silent as to the possibility that a developer might have to consider such services as a factor in development approval. The regulations are not sufficient to show that the county has exercised the legislatively delegated authority in the necessary manner. For this reason, the Board had no authority to require that the developer pay for or provide a plan for emergency medical services as a condition of the approval of the Beaver Meadows PUD. *Cf. Cottrell v. City & County of Denver,* 636 P.2d at 708–10.

### III.

The judgment of the Larimer County District Court must be reversed and the case remanded with directions to return the matter to the Larimer County Board of County Commissioners for proceedings not inconsistent with this opinion. On remand, before the Board may condition approval of the proposed PUD master plan on these same two requirements, it first must adopt proper regulations that address the matters discussed in this opinion and must afford an opportunity to Beaver Meadows and others who may be interested to present additional evidence relevant to any new regulatory criteria. Except for what we have said in the context of reviewing the imposition of the conditions by the Board, we express no opinion as to whether the county's present regulations, when applied to the findings and evidence now in the record, permit the county to deny Beaver Meadows' application for PUD master plan approval.[8]

Judgment reversed and case remanded.

7. The delegation may be broad and general, but it rationally and clearly encompasses the subject matter at issue. For this reason, our conclusion is, again, not inconsistent with the requirement that statutes delegating subdivision approval authority to counties must be strictly construed. *Pennobscot, Inc. v. Board of County Commissioners,* 642 P.2d 915, 919 (Colo.1982); *Board of County Commissioners v. Pfeifer,* 190 Colo. 275, 278, 546 P.2d 946, 947 (1976). The Board argues that a rule of strict construction is not applicable in this instance as the legislature has required that the provisions of the PUD act be "liberally construed in furtherance of the pur-

poses of this [act] and to the end that counties and municipalities shall be encouraged to utilize planned unit developments." § 24–67–107(6), 10 C.R.S. (1982). Because we conclude that the necessary statutory authority exists even under a rule of strict construction, we need not decide under what circumstances the judicially-created rule of strict construction must yield to the legislature's mandate to construe liberally the provisions of the PUD act.

8. In the amended complaint before the district court, Beaver Meadows, echoing its position consistently maintained in hearings before the

Board, offered to pay an equitable share of road improvement costs. It requested that the district court fashion a condition that accomplishes such equitable apportionment. Relief under C.R.C.P. 106(a)(4), however, is limited to a determination whether the Board exceeded its jurisdiction or abused its discretion, a limitation that precludes consideration of Beaver Meadows' request. For the same reason, on the record before us, we cannot consider Beaver Meadows' request that this court affirmatively order the Board to approve the PUD master plan on the grounds that "the County has been unable to show that the plan, on its face, does not comply with existing county resolutions and regulations."