WOLF CREEK SKI CORPORATION, Colorado Wild, and San Luis Valley Ecosystem Council, Plaintiffs–Appellees and Cross–Appellants,

v.

BOARD OF COUNTY COMMISSIONERS OF MINERAL COUNTY and Leavell–McCombs Joint Venture, Defendants–Appellants and Cross–Appellees.

No. 06CA0113.

Colorado Court of Appeals, Div. VI.

Sept. 20, 2007.

Hogan & Hartson, L.L.P., Andrew R. Shoemaker, Andrew L. Spielman, Jacqueline S. Cooper, Denver, Colorado, for Plaintiff–Appellee and Cross–Appellant, Wolf Creek Ski Corporation.

Jeffrey C. Parsons, Lyons, Colorado; Anna N. Ulrich, South Fork, Colorado, for Plaintiffs–Appellees and Cross–Appellants, Colorado Wild and San Luis Valley Ecosystem Council.

Richard J. Jacobs, P.C., Richard J. Jacobs, Alamosa, Colorado, for Defendant–Appellant and Cross–Appellee, Board of County Commissioners.

Berg Hill Greenleaf & Ruscitti, L.L.P., Josh A. Marks, Heidi C. Potter, Boulder, Colorado, for Defendant–Appellant and Cross–Appellee, Leavell–McCombs Joint Venture.

Opinion by Judge WEBB.

In this C.R.C.P. 106 action concerning the approval of a planned unit development

(PUD), defendants, Board of County Commissioners of Mineral County (the board) and Leavell–McCombs Joint Venture (the developer), appeal the portion of the trial court order that voided the board's approval because the PUD lacked sufficient access to the state highway system. Plaintiffs, Wolf Creek Ski Corporation (Wolf Creek), Colorado Wild, and the San Luis Valley Ecosystem Council, cross-appeal the portion of the order holding that the developer did not violate a scenic easement or a water decree, and that the board did not violate section 24–67–106(3)(b), C.R.S.2007, or their right to procedural due process.

We agree with the trial court that the board abused its discretion in approving the PUD because the PUD lacked year-around access to the state highway system. We also conclude that the trial court correctly rejected plaintiffs' contentions concerning the scenic easement and the water decree. Our determination that the board abused its discretion renders plaintiffs' other contentions moot. Therefore, we affirm the order and remand to the trial court with directions to remand to the board for further proceedings, which are not limited by statements in the trial court's order concerning what the developer must do.

## I. Background

In 1987, the developer obtained the property at issue in a land exchange with the United States Forest Service (Forest Service) and entered into a scenic easement agreement with the Forest Service. The property abuts the Wolf Creek Ski Area, which operates under a permit from the Forest Service, and it is completely surrounded by Forest Service land. The developer described the proposed project on this property as a "year-round recreational resort area that will enhance the existing ski area" that will house 10,000 persons (the Village).

In 1999, the developer submitted a preliminary development plan to the board. In 2000, the board approved the plan through Resolution 2000–13 (the preliminary approval), which set out a series of requirements for final approval. The final approval was defined as approval of the final development plan, the final plat, the Application for Designation of New Phase (ADNP) for Phase 1, and certain other documents. Phase 1 involved the construction of 500 dwelling units. The preliminary approval also contemplated separate approvals for each remaining phase of the development and presumed that utilities for the Village would be provided by the local utility company.

When the preliminary approval was adopted, vehicles could access the Village from State Highway 160 only via Forest Service Road 391 (FSR 391), which is maintained and regulated by the Forest Service. FSR 391 is a single lane, gravel road that is open to wheeled vehicles only from June through September. During the winter months, Wolf Creek operates ski runs over the road. FSR 391 was not included on the preliminary plat as the access road to the Village. The preliminary approval, section 4.6.11, stated, "The main access road shall be ... completed prior to the Supplemental Resolution covering phase 1."

The developer sought and received several extensions from the board to secure an alternative access road to the Village. However, the Forest Service never authorized any reconstruction of FSR 391. Nor did it grant the developer a permit for a different access road between State Highway 160 and the Village, although the developer's application for a permit remained pending. The developer was unable to obtain access approval from the Colorado Department of Transportation (CDOT) or a utility easement.

In June 2004, the developer applied to the board for final approval, relying on FSR 391. Because of inability to obtain a utility easement, the developer proposed construction of an electric power plant within the Village. The proposed power plant would be fueled by a stockpile of liquefied natural gas (LNG), which is a hazardous material under federal law. See 49 C.F.R. § 190–199.

Following several meetings at which Wolf Creek and Colorado Wild provided comments, the planning commission recommended final approval. At an October 26, 2004 hearing, during which Wolf Creek and Colorado Wild also provided comments, the

board approved the final plat and final development plan and announced it would consider the ADNP for Phase 1 at its regularly scheduled meeting on November 1, 2004. The ADNP for Phase 1 was approved at the November 1, 2004, meeting.

During the hearings, the county land use administrator stated that "the quality of access is a marketing issue and therefore of little concern to the County." Resolution 2004–21 (final approval) acknowledged that because the Village did not access a county road, state highway access would involve "compliance with state laws, rules, and regulations," and that access across Forest Service lands would be "controlled by compliance with federal laws, rules and regulations." It required:

> [A]n alternative access road or roads shall be constructed by the Developer in accordance with federal requirements.... No Supplemental Resolution shall be adopted for Phase 1 until the main access complies with federal requirements [and] the adequacy of access to the Development will be a condition of the adoption of every Resolution of Phase Approval following Phase 1.

## II. Standard of Review

C.R.C.P. 106(a) provides in relevant part:

> In the following cases relief may be obtained in the district court by appropriate action ...
>
> ...
>
> (4) Where any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy otherwise provide by law:
>
> (I) Review shall be limited to a determination of whether the body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body....

■ "The district court's review is based solely on the record that was before the governmental entity." *Prairie Dog Advocates v. City of Lakewood,* 20 P.3d 1203, 1206 (Colo.App.2000). The court of appeals reviews the governmental body's decision under "the same standard of review as the district court." *Id.*

■ To determine if an abuse of discretion has occurred, "the reviewing court may consider ... whether the hearing officer[s] misconstrued or misapplied the applicable law." *Bd. of County Comm'rs v. Conder,* 927 P.2d 1339, 1343 (Colo.1996) (quoting *Van Sickle v. Boyes,* 797 P.2d 1267, 1274 (Colo.1990)). The reviewing court may also consider whether there was "competent evidence in the record to support such decision." *Bd. of County Comm'rs v. Conder,* 927 P.2d at 1343.

■ Statutory interpretation is a question of law that we review de novo. *Ryals v. St. Mary–Corwin Reg'l Med. Ctr.,* 10 P.3d 654, 659 (Colo.2000).

■ Statutes should be interpreted to effect the General Assembly's intent, giving the words in the statute their plain and ordinary meaning. *Golden Animal Hosp. v. Horton,* 897 P.2d 833, 836 (Colo.1995). A statute should be interpreted as a whole, giving effect to all of its parts. *Zab, Inc. v. Berenergy Corp.,* 136 P.3d 252, 255 (Colo. 2006). "[W]e look at the context in which a statutory term appears, and the meaning of a word may be ascertained by reference to the meaning of words associated with it." *Robinson v. Colo. State Lottery Div.,* 155 P.3d 409, 413 (Colo.App.2006) *(cert. granted* Apr. 9, 2007); *Premier Farm Credit, PCA v. W–Cattle, LLC,* 155 P.3d 504, 513 (Colo.App. 2006).

■ If the language of a statute "is clear and the intent of the General Assembly may be discerned with certainty, we need not resort to other rules of statutory interpretation." *Western Fire Truck, Inc. v. Emergency One, Inc.,* 134 P.3d 570, 573 (Colo.App. 2006). But if the language is ambiguous, we look to "legislative history, prior law, the consequences of a given construction, and the goal of the statutory scheme to ascertain the correct meaning of a statute." *Bd. of County Comm'rs v. Costilla County Conservancy Dist.,* 88 P.3d 1188, 1193 (Colo.2004) (quoting *People v. Luther,* 58 P.3d 1013, 1015 (Colo. 2002)).

Courts also presume that the legislature intended a just and reasonable result, § 2–4–201(1)(c), C.R.S.2007, and courts will not interpret a statute in a manner that leads to an absurd or unreasonable result. *See, e.g., In re Marriage of Roosa*, 89 P.3d 524, 528 (Colo. App.2004).

### III. Access

Defendants first contend the board did not abuse its discretion by provisionally accepting FSR 391 as sufficient access. We disagree, although for somewhat narrower reasons than those articulated by the trial court.

### A. State Law

Section 30–28–133.1, C.R.S.2007, provides:

Subdivision plan or plat—access to public highways. No person may submit an application for subdivision approval to a local authority *unless* the subdivision plan or plat *provides*, pursuant to section 43–2–147, C.R.S., that all lots and parcels created by the subdivision *will have access* to the state highway system in conformance with the state highway access code.

(Emphasis added.)

Section 43–2–147, C.R.S.2007, provides in relevant part:

(1) (a) The department of transportation and local governments are authorized to regulate vehicular access to or from any public highway under their respective jurisdiction from or to property adjoining a public highway in order to protect the public health, safety, and welfare, to maintain smooth traffic flow . . . and to protect the functional level of public highways. . . .

(b) Vehicular access to or from property adjoining a state highway shall be provided to the general street system, unless such access had been acquired by a public authority. Police, fire, ambulance, and other emergency stations shall have a right of direct access to state highways. . . . [N]o person may submit an application for subdivision approval to a local authority unless the subdivision plan or plat provides that all lots and parcels created by the subdivision *will have access* to the state highway

system in conformance with the state highway access code.

(Emphasis added.)

The State Highway Access Code provides in relevant part:

1.5 Definitions and Abbreviations

. . . .

(3) "Access" means any driveway or other point of entry and/or exit such as a street, road or highway that connects to the general street system.

### B. Conditional Approval

We first reject defendants' contention that we need not decide whether FSR 391 was sufficient to meet the needs of the Village because the final resolution required additional access before the developer could sell any dwelling units.

The parties have cited no case, nor have we found one, interpreting the access requirement of section 30–28–133.1. The legislative history is uninformative.

■ We do not read the plain language of this statute to allow postponing access beyond the application for final subdivision approval. The statute imposes a condition ("unless") on a current activity ("submit an application") and uses a present tense term ("provides"). This condition would be meaningless if the application need only address how access might be obtained in the future. *See Black's Law Dictionary* 1224 (6th ed. 1990) ("Provide" is defined as "To make, procure, or furnish for further use, prepare. To supply; to afford; to contribute.").

■ While "will have access" expresses the future tense, in our view that wording reflects the three-phase progression of all regulated land development: (1) planning; (2) approval; and (3) build out. Thus, a subdivision "will have access" only when its internal roads have been completed and connected with a state highway. But that connection must still be provided for in the application. *Cf.* 2B *Sutherland Statutory Construction* § 49:02, at 10 (Norman J. Singer ed., 2000) ("[A] statute, expressed in general terms and written in the present or future tense, will be applied, not only to

existing but also prospectively to future things and conditions.").

This interpretation of section 30–28–133.1 is consistent with a letter from CDOT recommending against final approval until an access permit had been secured:

> The Department has completed its preliminary review of the above-referenced project that proposes a very large-scale development. Without a more detailed plan that outlines access points to the highway system, it appears that there will be significant impact to the highway at the intersection of State Highway 160. *This proposal will require an Access Permit* and a detailed Traffic Impact Analysis. *Until an exact arterial system is identified and any access issues resolved, we do not recommend final approval of the proposal.*

(Emphasis added.)

 Under this interpretation of section 30–28–133.1, final approval of a subdivision application predicated on obtaining access to the state highway system by an as yet undetermined route would be an abuse of discretion because the subdivision might never have the required statutory access.

Neither the Mineral County Subdivision Regulations (MCSR) nor any state land use delegation statute expressly defines final approval. The parties have not cited any land use case, nor have we found one in Colorado, that includes such a definition.

 According to James A. Kushner, *Subdivision Law and Growth Management* § 7.14 (2006), "Final approval ... constitutes recognition that all conditions for subdivision approval imposed by the local government body have been satisfied." We adopt this definition because it furthers prudent land use policy. A final approval creates vested development rights under which a reasonable developer could start construction. *See Jafay v. Bd. of County Comm'rs*, 848 P.2d 892, 902 (Colo.1993). But if a condition set forth in a purported final approval is not met, then the status of improvements made during the interim would be uncertain.

Here, such uncertainty persuades us that resolving the access problem is more than a "marketing issue." The final approval does not guarantee that the Village could ever be commercially viable because the developer may never obtain federal and state approvals for the "alternative access road" which the Village requires. Yet without that access road, under the final approval the developer could not sell any of the 500 Phase 1 dwelling units that it was authorized to build. The risk that unsellable improvements would not be maintained is at odds with subdivision approval to further "public health, safety, integrity, and general welfare." § 24–67–102(1), C.R.S.2007.

Such a conditional final approval would also burden the zoning authority to revisit and perhaps modify the condition or extend the time for compliance. A similar burden would fall on members of the public who opposed the development, but would have to continue appearing at subsequent proceedings to preserve their opposition whenever the zoning authority revisited the condition. *See* § 24–67–104(1)(e), C.R.S.2007 (the county resolution must set "forth the procedures pertaining to the application for, hearing on, and tentative and final approval of a planned unit development which shall afford procedural due process to interested parties").

 Accordingly, we reject defendants' contention that even if FSR 391 did not meet the statutory access requirement, the final approval's conditional language and requirement of future access adequately resolved the access issue.

### C. Adequacy of FSR 391

We now address whether the board abused its discretion in accepting FSR 391 as meeting the state highway access requirement, and conclude that it did.

#### 1. Meaningful and Adequate Access

Initially, we agree with defendants that the trial court erred in evaluating access to the Village based on "meaningful and adequate access in relation to the property in question and the purpose for which the zoning change is being requested." Because the Mineral County Zoning Regulations and the MCSR do not include criteria for adequate highway access, the court's reliance on *Beaver Mead-*

*ows v. Board of County Commissioners*, 709 P.2d 928 (Colo.1985) (*Beaver Meadows* ), for this standard was misplaced.

The trial court held that the board's reliance on FSR 391 as access for the Village "sufficient to comply with C.R.S. § 30–28–133.1 or M.C.S.R. 2.4.1.4 . . . is not supported by the record and is an abuse of discretion." It explained:

> It is not possible to utilize the single-lane, gravel, seasonally-closed road for the kind of services that are required in a development of this size and scope—even for its first phase. Vehicle use such as solid waste disposal, emergency medical services, law enforcement services, and liquefied natural gas service cannot be provided on this road, and thus there is not meaningful access as required by statute.

The court relied on the following language in *Beaver Meadows*, 709 P.2d at 935:

> We believe, however, that it would defy reason to conclude that the legislature intended that a PUD application should be reviewed without taking into account the adequacy of access roads to assure the health and safety of persons traveling to and from the development and the conformity of such roads with the comprehensive plan.
>
> To hold that the county should engage in PUD review oblivious to these critical public concerns would be to ignore the pervasively expressed legislative intent that counties plan, zone and regulate to provide a safe and efficient network of roadways, as reflected in the planning, zoning, subdivision and PUD statutes.

However, reliance on that language to resolve the access issue here overlooks both the supreme court's attempt to "determine whether the applicable statutes and regulations support this purported exercise of power by the Board," *id.* at 933, and its ultimate conclusion that the county board had acted without authority in conditioning approval of a PUD on the developer's improvement of a county road that provided access to the development.

The supreme court first noted that state enabling statutes authorize counties to adopt master plans that include provisions dealing with "[t]he general location, character, and extent of existing, proposed, or projected streets or roads," § 30–28–106(3)(a)(I), C.R.S.2007 as well as zoning regulations that address "lessening the congestion in the streets or roads or reducing the waste of excessive amounts of roads." § 30–28–115(1), C.R.S.2007.

The court also noted that under section 30–28–133.1, "all lots and parcels created by the subdivision will have access to the state highway system in conformance with the state highway access code." And it pointed to a provision of the Planned Unit Development Act of 1972, sections 24–67–101 to –108, C.R.S.2007, that addressed approval "[t]o lessen the burden of traffic on streets and highways." § 24–67–102(1)(f), C.R.S.2007.

Nevertheless, the court concluded that "none of these provisions specifically and expressly authorizes a county to condition approval of a PUD application upon the developer's improvement of the public roads providing access to the PUD." *Beaver Meadows*, 709 P.2d at 935. The court turned to "whether the county has exercised the statutory authority by enactment of regulations sufficiently specific to empower the Board to impose the condition for access road improvements at issue in this case," and concluded that "the regulations lack the detail necessary to implement" the statutory intent that the board consider adequacy of access and impose the conditions at issue. *Id.*

While the court recognized that the state had delegated its police power over land development to political subdivisions, it cautioned that "there must be sufficient standards and procedural safeguards involved in the delegation and subsequent implementation to ensure that any action taken by a county in response to a land use proposal will be rational and consistent and that judicial review of that action will be available and effective," meaning that county regulations must be "sufficiently detailed to provide all users and potential users of land with notice of the particular standards and requirements imposed by the county for PUD approval." *Id.* at 936.

After a detailed examination of the county regulations at issue, the court found them "devoid of standards by which the adequacy of an access road can be evaluated and remedial measures prescribed," such as "grades, sight distances, width, shoulders, vertical or horizontal curves, drainage, or types of surfaces." *Id.* at 937.

As in *Beaver Meadows,* here the Mineral County Zoning Regulations and MCSR lack standards by which the adequacy of an access road connecting the Village and State Highway 160 could be determined. The *Beaver Meadows* court observed, 709 P.2d at 937–38, "appropriate design for a road to serve a remote mountain development can be the subject of vigorous, honest disagreement among knowledgeable professionals." But without such standards here, there can be no assurance that "county action in response to a PUD application will be rational and consistent and that judicial review of that action will be available and effective." *Id.* at 938.

We are not persuaded otherwise by MCSR section 2.4.1.4, to which the trial court referred. This section provides in relevant part:

2.4 Subdivision Exemptions—Exemptions from these Subdivision Regulations may be granted if the following provisions are satisfied by the Applicant(s).

2.4.1 Definitions:

. . .

2.4.1.4 Application—.... At a minimum, the Application shall include clear evidence of legal access from the tracts to be created to the public highway system....

Thus, the exemption applies only to "the separate deeding and ownership of two tracts to be created from a parent parcel," *see* MCSR section 2.4.1.5, not to a multi-tract development such as the Village. Moreover, even if section 2.4.1.4 applied to the Village, it provides no standards for determining the adequacy of access, as required by *Beaver Meadows.*

Similarly, section 30–28–133.1 is too general to serve as authority for determining adequacy of access. Once the *Beaver Meadows* court cited this statute, the court would not have addressed the lack of standards in the county's regulations if it believed that the statute provided sufficient standards.

We also reject plaintiffs' assertion that the access requirements for final approval set forth in the preliminary approval, establish sufficient criteria.

Section 4.6.11 of the preliminary approval includes language very similar to that quoted above in the comparable section of the final approval. Both resolutions require "compliance with state laws, rules and regulations" and "federal laws, rules, and regulations." The preliminary approval sets forth no standards of the type discussed in *Beaver Meadows.* Nor have we been presented with any federal standards that would satisfy *Beaver Meadows.*

■ Accordingly, unlike the trial court, we do not consider whether the record shows "meaningful and adequate access in relation to the property in question and the purpose for which the zoning change is being requested." Instead, we return to section 30–28–133.1, and conclude that because we interpret the statute as requiring at least year-around wheeled vehicular access, the record provides no support for finding that FSR 391 met this requirement.

### 2. Mere Legal Access

Defendants next contend mere legal access is adequate. We disagree.

■ As legal access, defendants rely on the Forest Service's obligation to provide reasonable access to those landowners whose property is surrounded by Forest Service land. *See* 16 U.S.C. § 3210(a). However, this access guarantee does not require that the Forest Service waive environmental or use restrictions. *Tieze v. Killam,* —— P.3d ——, ——, 2007 WL 177677 (Colo.App. No. 04CA2442, Jan. 25, 2007). Thus, obtaining wheeled vehicle access year around will require further action by the Forest Service concerning a route over its land.

The state highway system serves wheeled vehicles. Concluding that the General Assembly would allow an applicant to provide for access from that system to a subdivision based on mere legal access to a route which

did not accommodate wheeled vehicles year around would be an absurd and unreasonable result. *Cf. In re Petersen,* 51 Cal.2d 177, 193, 331 P.2d 24, 34 (1958) ("The right of access has been defined as extending to a use of the road for purposes of ingress and egress to his property by such modes of conveyance and travel as are appropriate to the highway and in such manner as is customary or reasonable.").

Defendants' definitions of access are consistent with this interpretation. *Webster's Third New International Dictionary* 11 (2d ed.1961), defines access as "a landowner's legal right to pass from his land to a highway and to return without being obstructed." A road closed to wheeled vehicles during the winter months would obstruct access to and from the Village. *See also Black's, supra,* at 14 ("the term 'access' denotes the right vested in the owner of the land which adjoins a road or other highway to go and return from his own land to the highway without obstruction").

Therefore, we conclude that section 30–28–133.1 requires at a minimum year-around wheeled vehicle access between State Highway 160 and the Village. Because FSR 391 is not usable by wheeled vehicles during the winter, we are not persuaded that it satisfies the purpose of section 30–28–133.1.

In reaching this conclusion, we recognize that because here any access road must cross Forest Service land, CDOT's authority may be limited to approving the point where Village traffic would exit and enter State Highway 160. *Cf.* State Highway Access Code § 1.5(3). We express no opinion on the scope of CDOT's authority where a county road provides access from a subdivision to a state highway.

Nevertheless, the record includes no evidence that the developer has resolved with CDOT an access point onto State Highway 160. Indeed, until the capacity and location of an access road across Forest Service land has been determined, the developer could neither address a specific access point nor undertake the Traffic Impact Analysis sought by CDOT.

Accordingly, we further conclude that the board abused its discretion in granting final approval, because the record contains no evidence of year-around access to the state highway system at the time of final approval.

## IV. Cross–Appeal

Plaintiffs contend the trial court should also have determined that the board abused its discretion because the developer did not comply with the preliminary approval concerning a water decree and did not satisfy the scenic easement, and that the board violated their right to procedural due process. We address and reject the water decree and the scenic easement contentions because they may arise on remand. Our conclusion in Section III renders the due process issue moot, and thus we will not address it.

### A. Water Decree

We reject plaintiffs' argument that the board abused its discretion in granting final approval because the developer had not obtained an amendment to the water decree.

Section 4.6.40 of the preliminary approval provides in relevant part:

> The Plan of Augmentation approved by the Water Court in 1990 must be amended *as required by the Water Court decree or Colorado law* to recognize the changes in the Development, as proposed, subsequent to the approval of such plan.

(Emphasis added.)

After the preliminary approval, the developer sought to shift its water storage from ponds to tanks. The following record evidence supports the conclusion that no amendment to the water decree was necessary: (1) a letter from the developer's attorney; (2) testimony from the County Attorney; (3) a letter from the developer's water engineer; (4) a letter from the State Division Engineer for Water Division 3; and (5) no request for action by the water court.

### B. Scenic Easement

We also reject plaintiffs' argument that the board abused its discretion in granting the final approval because the developer was in violation of the scenic easement by storing

hazardous products, exceeding a height limitation, and conducting industrial activities.

■■ Generally we address only arguments that were raised in the administrative proceedings under review. *Abromeit v. Denver Career Serv. Bd.,* 140 P.3d 44, 53 (Colo. App.2005).

The scenic easement provided in relevant part:

b. All buildings structures, and signs shall comply with the following requirements:

iii. Building height shall be no greater than 48 feet.

. . .

c. The following uses may not occur on the easement area:

. . .

(xi) permanent hazardous products storage. . . . .

e. No mining or industrial activity shall be conducted by the Grantors or their successors and assigns on the real property which is subject to this easement.

The scenic easement is a private contract enforceable only by the Forest Service. It contains a detailed dispute resolution procedure that must be implemented before enforcement and a provision which allows the Forest Service to waive any purported violations.

Plaintiffs presented no evidence to the board that the Forest Service believed the developer was in violation of the easement. Even assuming that stockpiling of LNG at the Village to fuel the power plant could constitute impermissible hazardous products storage, we discern no basis on which the board could have denied approval unless the record showed that (1) the Forest Service asserted a violation of the easement; (2) the resolution procedures in the easement upheld that position; and (3) the Forest Service must not waive the violation.

■■ This conclusion is consistent with our rejection of defendants' conditional approval argument in Section III(B). Because the statute requires that a subdivision applicant provide for access, the final resolution's conditional approach did not suffice. In contrast, we cannot determine whether the developer is in compliance with the scenic easement requirements because it is a private contract to be enforced by the Forest Service. *See Mapes v. City Council,* 151 P.3d 574, 577 (Colo.App.2006) (we enforce contracts "as written unless there is an ambiguity in the language").

Moreover, as regards the alleged building height and industrial activity violations, plaintiffs do not dispute the developer's assertion that they failed to raise those arguments before the board. Thus, we will not consider them. *See Abromeit v. Denver Career Serv. Bd.,* 140 P.3d at 53.

Accordingly, we conclude that the final approval was not an abuse of discretion as to the water court decree and the scenic easement.

## V. Further Proceedings Before the Board

Finally, defendants contend that even if we affirm, the trial court exceeded its jurisdiction by placing requirements on the developer in subsequent proceedings before the board. We agree.

■■ Once a court finds that an administrative body has abused its discretion, how to address that deficiency on remand is within the discretion of the administrative body. *Carney v. Civil Serv. Comm'n,* 30 P.3d 861, 866–67 (Colo.App.2001).

■■ Our review is based solely on the record before the board without regard to the trial court's findings. *See Prairie Dog Advocates v. City of Lakewood,* 20 P.3d at 1206. We do not consider statements of a reviewing body that are merely dicta. *Pub. Serv. Co. v. Pub. Utils. Comm'n,* 653 P.2d 1117, 1119 (Colo.1982); *North Eastern Motor Freight, Inc. v. Pub. Utils. Comm'n,* 178 Colo. 433, 437, 498 P.2d 923, 925 (1972).

After ruling that access was inadequate, the trial court gave instructions to the board on remand:

At such time as the Joint Venture has obtained an adequate year-round access from the National Forest and/or Wolf Creek and confirmation that CDOT has granted a permit to access to State High-

way 160 at the location of the easement, the Developer may request that Mineral County give notice of new public hearings for the Planning Commission and the board as required by the zoning and subdivision regulations.

 The trial court's statements regarding what the developer must do on remand are dicta. Accordingly, we conclude that those statements do not limit the board's discretion.

The order is affirmed, and the case is remanded to the trial court with directions to remand to the board for further proceedings consistent with this opinion.

Judge LOEB and Judge RUSSEL concur.