689 P.2d 699 (1984)
Don VICK, Trustee, Petitioner-Appellant,
v.
The BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF LARIMER, State of Colorado, Courtlyn Hotchkiss, Commissioner, James Lloyd, Commissioner, and Nona Thayer, Commissioner, The Larimer County Planning Commission, Paul Vanhorn, Jean Johnson, Ken Montgomery, Marian Maggi, Bob Streeter, Wes Wesfall, Shirley Ferrier, Jim Caufield, and Frances Moore, Planning Commission, Respondents-Appellees.
No. 83CA0582.
Colorado Court of Appeals, Div. III.
May 24, 1984.
Rehearing Denied June 28, 1984.
Certiorari Denied September 24, 1984.
*700 Chilson & Stanton, P.C., John H. Chilson, Loveland, for petitioner-appellant.
Harden, Schmidt & Hass, P.C., George H. Hass, Fort Collins, for respondents-appellees.
STERNBERG, Judge.
Petitioner, Don Vick, as trustee for the owner of 73 acres of land located in an unincorporated portion of Larimer County, sought approval of a subdivision plat from the Board of County Commissioners. The Board refused to approve the plat, and Vick sought review in the district court pursuant to C.R.C.P. 106(a)(4). The court upheld the action of the Board. Vick appeals and we reverse.
The land in question is located near the City of Estes Park. Property elevations range from 8900 to 9400 feet, and slopes average 20% with a maximum of 40%. The property was zoned for single family residences, and the subdivision plat submitted by Vick proposed dividing the property into single family lots ranging in size from 2.4 to 5.2 acres.
The plat was submitted to the City of Estes Park whose Planning Commission recommended approval. However, the Larimer County Planning Commission considered the plat and recommended that it not be approved. A public hearing on the plat was then scheduled before the Board. The County Planning Staff submitted a report critical of the plat, setting forth proposed findings of fact which it recommended the Board adopt in refusing to approve the plat. Following a public hearing, the Board did not approve the plat and adopted the findings submitted by the Planning Staff.
Larimer County by resolution had adopted a land development Master Plan, and it has zoning and subdivision regulations. The Vick subdivision plat satisfied all requirements of the zoning and subdivision resolutions. However, the basic reason the Board did not approve the plat was the plat's alleged failure to comply with the Comprehensive or Master Plan for the county. This Plan is referred to in the subdivision regulations wherein it is provided that: "In designing and planning subdivisions, consideration should be given to the Larimer County Master Plan and the Larimer County Zoning Regulations." Thus, it is contended that compliance with the Master Plan is a requirement if one is to comply with the subdivision regulations.
The Larimer County Master Plan consists of several portions related to different areas of the county. With respect to the area in question, the County adopted the 1977 Comprehensive Plan of the City of Estes Park by this language: "An area land use plan for the Town of Estes Park and the surrounding area has been developed and adopted by the town. Both these plans have been adopted by the county and function as elements of the Comprehensive Plan."
In refusing to approve the Vick plat, the Board gave many reasons of a general nature which can only be described as vague and as having no foundation in any resolution or any regulation. Among these are the finding that the site distance *701 at the southern planned access to the subdivision was substandard, that four lots could be adversely affected by traffic noise, that Vick refused to dedicate an access easement or to build a trailhead to adjoining wilderness land. The Board also expressed concern with the amount of time it would take emergency vehicles to arrive at the site, should they be needed. The Board noted that future problems with the development could arise and that the plat was incompatible with the surrounding area. Also, the Board found that the plat did not comply with the Larimer County Policy Plan directing that new residential developments should be located where its residents would expend the least amount of energy for transportation to work, shopping, and community services.
The Board concluded that approval would not promote the convenience, prosperity, and general welfare of the immediate inhabitants of the area, nor be in the best interests of the people of the county. However, none of these reasons, individually or collectively, form a sufficient basis for the refusal to grant approval of the plat.
Denial based upon these reasons was arbitrary, capricious, and an abuse of discretion. Such unfettered restrictions on the right of property owners to use land cannot stand. This is made especially clear by the fact that several other residential developments had been approved in this area. A subdivision plat may not be disapproved if the subdivision controls or regulations have been complied with. Reynolds v. City Council, 680 P.2d 1350 (Colo.App. 1984); RK Development Corp. v. City of Norwalk, 242 A.2d 781 (Conn.1968); 8 E. McQuillin, Municipal Corporations § 25.118c at 347 (3d rev. ed. 1983). Nor may the plat be disapproved merely because the developer fails or refuses to comply with unauthorized or irrelevant conditions. McQuillin, supra.
The Board, however, did make reference to three specific instances in which the plat was inconsistent with the Master Plan, i.e., the City of Estes Park Plan adopted by the County. These three instances become the critical elements in this review. The Board refused to approve the plat because the property is above 8100 feet in elevation, because the property is located in a wildfire hazard area, and because it is located in an area with slopes in excess of 30%. We address each of these factors below, concluding that denial on any of these bases cannot stand. Indeed, it appears that the county, in effect, is using the broad generalities of the Master Plan to rezone property without having followed proper procedures.

A. Property Above Elevation of 8100 Feet.
The Estes Park Plan provides:
"The Town recently has revised the limit of water service from a maximum elevation of approximately 7840 feet to elevation 8100 feet.... No areas of development are shown above this elevation unless they are already in existence. It is assumed that areas above this elevation might be proposed for future development using individual wells or a special water system; however, since they will not be in the main area for designated development as established by water service and other factors, special review planning and design considerations should be required of the developer as determined necessary in each case by the Planning Commission."
The plat was simply dismissed as being "inconsistent" with the Comprehensive Plan because it was above 8100 feet in elevation. This despite the fact that Vick had submitted evidence at the hearing that a private water system would serve the area and that test wells had already been drilled. The Estes Park Plan does not compel denial of plats located above 8100 feet, but the Board applied the provision to deny Vick's right to develop property located above that elevation.

B. Property Located in Severe Wildfire Hazard Area
The Estes Park Plan provides:

*702 "Extreme wildfire hazard is generally the result of a combination of relatively steep slope and dense vegetation. The condition of human habitation in wildfire hazard areas creates a potentially dangerous situation because of man's use of fire or flame. Since such extreme wildfire hazard areas are usually also areas of steep slope, in many cases little interest is expected in the development of these areas; however, due to their potential danger to life and property, all areas identified as extreme wildfire hazard areas have been excluded to a large degree from any development designation in the Future Land Use Plan other than as open space."
Vick presented a wildfire mitigation plan which a district forester recommended that the Planning Commission approve as a "good one, adequate for the existing hazard." However, the Board summarily classified the plat as being "located in a severe wildfire hazard area," again effectively rezoning property located in such classified areas as property on which development would not be permitted.

C. Property Located in an Area With Slopes in Excess of 30%
The Estes Park Plan provides:
"Some of the land between 16% and 30% slope and nearly all areas over 30% should be left in a natural state as open areas since they are difficult to develop. Even if some of these steeper slope areas are built upon, it necessarily should be only scattered single family residences which will not significantly affect the scenic qualities of such areas as open space...."
The Plan also notes that in areas with slopes between 16-30%, the suitability of development is "difficult" and recommends limited development on individual sites, and that in areas with slopes greater than 30%, development is normally unsuitable and recommends that development be "[l]eft in conservation or low-intensity recreation use or scattered single family homes on large lots with careful design and site placement consideration."
On the subject property, the average slope was 20% and evidence was presented to the Board that all of the proposed lots had building sites which were on grades of less than 30%. And again, though the Estes Park Plan does not prohibit such development as proposed here, the Board effectively rezoned the property to allow no development.
In Theobald v. Board of County Commissioners, 644 P.2d 942 (Colo.1982), it was noted:
"Conceptually, a master plan is a guide to development rather than an instrument to control land use.... On the other hand, it is the task of the legislative body charged with zoning to individually apply the broad planning policies to specific property, consistent with the public interest, and with notions of due process and equal protection." (emphasis added)
Here, it is evident that the Master Plan was used by the Board as an instrument to control Vick's use of the land. Instead of being used as a guide to future zoning in the county, it was used, in effect, to rezone the property from FO-Forestry and A-Accommodations both of which permit single-family residencesinto a classification in which residences are not permitted. We find this to be an impermissible use of a Comprehensive Plan. As stated in Theobald, supra:
"The general rule is that zoning should be enacted in conformance with the comprehensive plan for development of an area.... However, the master plan itself... is generally held to be advisory only, and not the equivalent of zoning...."
If a county zones property to permit single-family residences, but, because of its altitude, severity of grades and the danger of forest fire, thereafter decides that the property is not suitable for such development, then a zoning resolution containing adequate standards should be adopted to regulate residential use. As stated in Western Paving Construction Co. v. *703 Board of County Commissioners, 181 Colo. 77, 506 P.2d 1230 (1973): "[W]hen the matter is permitted by right in the zone created and either through an environmental concern or a change of circumstances the use is incompatible with prior usage, the proper procedure is to amend the zoning resolution." (emphasis added)
Therefore, we agree with Vick that the Board's refusal to approve his preliminary plat was an abuse of discretion and in excess of its jurisdiction.
The judgment of the trial court approving the Board's action is reversed and the cause is remanded for further proceedings consistent with this opinion.
VAN CISE and METZGER, JJ., concur.