The BOARD OF COUNTY COMMISSION-
ERS OF LARIMER COUNTY, Courtlyn
Hotchkiss, James Disney and Janet Du-
vall, County Commissioners, Petitioner,

v.

Steve CONDER and Wendy Sommervold,
Respondents.

No. 95SC431.

Supreme Court of Colorado,
En Banc.

Dec. 9, 1996.

Harden, Schmidt, Hass, Haag & Hallberg, P.C., George H. Hass, Jeannine S. Haag, Larimer County Attorney's Office, Fort Collins, for Petitioner.

John H. Chilson, Loveland, for Respondents.

Justice LOHR delivered the Opinion of the Court.

This case presents the issue of whether a county can adopt a requirement in its subdivision regulations that subdivision proposals comply with the county's master plan provisions, and then rely upon non-compliance with master plan provisions in denying a subdivision application. The Board of County Commissioners of Larimer County denied the application of Steve Conder and Wendy Sommervold for a proposed subdivision in rural Larimer County. On certiorari review under C.R.C.P. 106(a)(4), the Larimer County District Court affirmed the denial. Conder and Sommervold appealed, and the Colorado Court of Appeals reversed, holding that the Board of County Commissioners acted arbitrarily, capriciously, and abused its discretion in denying approval of the subdivision application. *Conder v. Board of County Comm'rs of Larimer County,* No. 94CA0848, slip op. at 4, 6 (Colo.App. May 4, 1995). We granted certiorari to review the court of appeals' decision and now reverse and remand with directions.

I.

Steve Conder and Wendy Sommervold (proponents) propose to develop a 560.76 acre parcel in the southern part of Larimer County into the "Windemere Acres Subdivision" (Subdivision). The proponents seek to divide the property into fifty-six lots, generally ranging in size from 2.3 to 5.4 acres, with nine perimeter lots larger than thirty-five

acres. The parcel that the proponents intend to subdivide is zoned FA–1, a "Farming District." Larimer County's "Comprehensive Zoning Resolution" permits single family dwellings with minimum lot areas of 100,000 square feet [1] in areas zoned FA–1.[2] The Larimer County Land Use Plan, which is the master plan for the County, categorizes the area in which proponents' parcel is located as "rural." Larimer County Planning Department, "Planning Staff Report" at 26 (Aug. 23, 1993).

The proponents filed a subdivision application in November of 1992.[3] The Larimer County Planning Commission (Planning Commission) held a hearing to review the application on December 16, 1992, and the Larimer County Planning Department (Planning Department) recommended that the Planning Commission deny the application.[4] The proponents attempted to address the concerns of the Planning Department at the hearing:

[The proponents] wanted to point out that their desire is to keep this area rural and attempted this by surrounding the subdivision by 35 acre parcels. These parcels will have recorded covenants also which prohibit more than one residential residence, and are also controlled by the subdivision's architectural control committee in regard to fencing, home size, and construction of any out buildings.

Larimer County Planning Commission, "Minutes" at 7 (Dec. 16, 1992). The Planning Commission, with one of the six commissioners abstaining, unanimously voted to deny the proponents' subdivision application, primarily based on the perception that the Subdivision would not be compatible with a rural location.

The proponents responded by submitting a revised subdivision application in May of 1993, attempting to address the concerns of the Planning Department. One of the changes that the proponents made was to include the nine lots that were greater than

---

**1.** An acre is equivalent to 43,560 square feet. *E.g.*, Webster's Ninth New Collegiate Dictionary 1338 (9th ed.1989) (table of "weights and measures"). A minimum lot size requirement of 100,000 square feet therefore requires a minimum lot of approximately 2.296 acres for each single family dwelling.

**2.** One-half acre lots are permitted where both public water and public sewer facilities are utilized. The proponents, however, propose to use individual septic systems for sewage disposal.

**3.** In their initial subdivision proposal, the proponents sought to develop 249.6 acres into sixty-four lots, with a minimum lot size of three acres. In a "Concept Technical Review" with planning staff personnel, *see infra* note 4, on October 1, 1992, the planning staff expressed several concerns:

Staff must also consider how this proposed development conforms with the adopted County Land Use Plan. This area is designated on the Plan as Rural. The criteria used to evaluate development proposals within the Rural area include protection of agricultural uses and encouraging development only at very low intensities which do not require urban-level services. The Plan encourages Rural areas to retain their existing character and open nature. It encourages residential development to be completed in a manner that consolidates services and maintains large blocks of open space. The Plan also states that because of lack of services, rural areas are generally inappropriate for subdivision activity. Adequate facilties [sic] should be provided without subsidy by other county residents and the county should not be obligated to provide an urban level of service outside designated urban areas. The applicants should carefully consider and implement these comments as well as those of the reviewing agencies below when submitting this proposal for the Planning Commission. Larimer County Planning Staff, "Agenda Concept Technical Review" at 3 (Oct. 1, 1992).

The proponents then revised their subdivision proposal and on November 11, 1992, formally applied to develop 243.7 acres into sixty lots, with 228.7 acres devoted to residential lots and 15 acres devoted to open-space. This subdivision application also called for a minimum lot size of three acres.

**4.** "The board of county commissioners of any county within the state is authorized to appoint a commission of not less than three nor more than nine members, to be known as the county planning commission." § 30–28–103(1), 12A C.R.S. (1986). The record does not contain an organizational chart for Larimer County government, but it appears that the Planning Department consists of persons with education and experience in various aspects of land planning and provides technical assistance and recommendations to the Planning Commission. As best we can determine, the Larimer County Planning Staff, referenced in the record, is part of the Planning Department.

thirty-five acres within the Subdivision boundaries, so that the average lot size for the Subdivision increased to approximately ten acres.[5]

The Planning Commission considered the proponents' revised subdivision application on July 21, 1993, and recommended that the Larimer County Board of County Commissioners (Board) deny the application. The Planning Commission adopted the Planning Department's findings that "[t]he proposed Preliminary Plat is not consistent with the Larimer County Land Use Plan in location of the proposed use, intensity of use, design, consolidation of services, and maintenance of rural character." Larimer County Planning Commission, "Minutes" at 6–7 (July 21, 1993) (adopting staff findings found in Larimer County Planning Department, "Planning Staff Report" at 4 (July 21, 1993)).

On August 23, 1993, the Board considered the revised subdivision application in a public hearing. The "Agenda" for the meeting included two "major issues and concerns" regarding the application:

1. The primary concern with the proposal, and the reason the Planning Department recommended denial on the first request, remains the same. The project is located in a rural agricultural area of Larimer County. The proposed subdivision appears suburban rather than rural in character. The Larimer County Land Use Plan guidelines for rural development emphasize low-intensity design that consolidates services and maintains large blocks of open space. Despite the reduced number of lots, only about 10% of the proposal is common open space. Planned Unit Developments, for example, require a minimum of 30% open space.

   The Land Use Plan states that because of lack of services, rural areas are generally inappropriate for subdivision activity. Adequate facilities should be provided without subsidy by other County residents and the County should not be obligated to provide an urban level of service outside designated urban areas. The Planning Department is concerned that this intensity of development will negatively impact provision of services in the area and create expectations for an urban level of service where it cannot be realistically provided.

2. Inclusion of some of the surrounding 35 acre tracts in the subdivision boundary may create more problems than benefits. These tracts are not integrated into the subdivision road system and apparently will be accessed by easements and private roads, or directly from the County Roads. The existing access to some of these tracts is very poor. The Planning Department is concerned that all subdivision lots meet County subdivision standards.

   The applicant may believe that inclusion of the 35 acre tracts is beneficial as it reduces the average lot size for all lots to approximately 10 acres. Plat notes indicate a belief that this somehow makes the subdivision "rural." The Planning Department sees no difference in the impact of the development between 35 acre tracts inside the subdivision or surrounding it.

*See* Larimer County Board of Commissioners, "Agenda" (Aug. 23, 1993) ("major issues and concerns" for "Agenda" outlined in attached Larimer County Planning Department, "Planning Staff Report" at 26 (Aug. 23, 1993)).

After a hearing, the Board voted unanimously to deny the subdivision application. In rejecting the application, the Board issued written findings, determining that the proposed subdivision was inconsistent with the Larimer County Land Use Plan in several specified respects—in general, because the nature of the proposed development was not

---

5. As a general rule, one can build a single-family residence on a parcel consisting of "thirty-five or more acres per [ownership] interest" without complying with a county's subdivision regulations. *See* § 30–28–101(10)(c)(I), 12A C.R.S. (1986 & 1996 Supp.); *see also Pennobscot, Inc. v. Board of County Comm'rs*, 642 P.2d 915, 918–19 (Colo.1982) ("[T]he term, subdivision, 'shall not apply to any division of land which creates parcels of land each of which comprises thirty-five or more acres of land and none of which is intended for use by multiple owners.'") (citing § 30–28–101(10)(b), 12 C.R.S. (1977 & 1981 Supp.)).

consistent with the contemplated rural character of the area.[6] The Board also quoted essentially verbatim the Agenda's aforementioned "major issues and concerns," *supra* pp. 1341–42, with regard to inadequate services for the Subdivision and the proponents' inclusion of the thirty-five acre tracts within the Subdivision's boundaries.

The proponents then sought a declaratory judgment and review of the Board's decision pursuant to C.R.C.P. 106(a)(4) in the Larimer County District Court.[7] The court affirmed the Board's decision based on two grounds. First, the court determined that although "incompatibility with the [master] plan weighed large in the minds of the commissioners," the Board based its denial of the subdivision application on "other concerns" as well. Second, the court held that "reliance on or reference to the comprehensive land use plan" was an appropriate basis for the Board's decision. In affirming the Board's denial of the subdivision application, the court rejected the proponents' constitutional due process claims and held that the proponents had adequate notice of the need to comply with the master plan provisions and that the plan contained sufficiently specific guidelines "within the ordinary understanding of reasonable people." [8]

The proponents appealed, and the Colorado Court of Appeals reversed, holding in an unpublished opinion that although the Board "could properly utilize the master plan as one factor in evaluating [the proponents'] application," the Board "acted arbitrarily, capriciously, and abused its discretion" in denying that application because "there was no competent evidence in opposition other than mere assertions that the proposal was inconsistent with the master plan." *Conder*, No.

94CA0848, slip op. at 4, 6. We then granted the Board's petition for certiorari review.[9]

## II.

■ In determining whether the Board properly denied the proponents' subdivision application, we are guided by principles of appellate review applicable to C.R.C.P. 106(a)(4), which provides for relief by appropriate action in district court:

> (4) Where any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy otherwise provided by law:
>
>> (I) Review shall be limited to a determination of whether the body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer.

In determining whether a body or officer "exceeded its jurisdiction or abused its discretion," C.R.C.P. 106(a)(4)(I), the district court in this case correctly noted that "[i]n order for the Court to set aside the decision of an inferior body on review pursuant to Rule 106, there must be no competent evidence in the record to support such decision," (citing *Ford Leasing Dev. Co. v. Board of County Comm'rs*, 186 Colo. 418, 425, 528 P.2d 237, 240 (1974); *Dillon Cos. v. City of Boulder*, 183 Colo. 117, 123, 515 P.2d 627, 630 (1973)). Furthermore, "[i]n a C.R.C.P. 106(a)(4) proceeding, the reviewing court may consider, in determining the existence of an abuse of discretion, whether the hearing officer misconstrued or misapplied the applicable law." *Van Sickle v. Boyes*, 797 P.2d 1267, 1274 (Colo.1990) (citing *Electric Power*

---

6. The relevant findings are quoted *infra* pp. 1349–50.

7. The proponents also sought mandamus pursuant to C.R.C.P. 106(a)(2). The proponents later withdrew their mandamus claim prior to the district court's ruling.

8. The proponents specifically alleged due process concerns relating to notice and specificity in asserting their claims for relief pursuant to C.R.C.P. 106(a)(4).

9. We granted certiorari on the following issue:

> Whether the decisions of this Court in *Theobald v. Board of County Commissioners* [ 644 P.2d 942 (Colo.1982),] and *Beaver Meadows v. Board of County Commissioners* [ 709 P.2d 928 (Colo.1985),] allow a county to self-impose a requirement that subdivision plats comply with the intent and purposes of a duly adopted county comprehensive master plan as a condition of subdivision approval.

*Research Inst., Inc. v. City & County of Denver,* 737 P.2d 822, 825–26 (Colo.1987); *Rosenberg v. Board of Educ.,* 710 P.2d 1095, 1099 (Colo.1985)).

### III.

The General Assembly adopted the "Local Government Land Use Control Enabling Act of 1974" ("Act"), §§ 29–20–101 to –107, 12A C.R.S. (1986 & 1996 Supp.), declaring that "the policy of this state is to clarify and provide broad authority to local governments to plan for and regulate the use of land within their respective jurisdictions," § 29–20–102, 12A C.R.S. (1986). "[E]ach local government within its respective jurisdiction has the authority to plan for and regulate the use of land" by "[r]egulating the location of activities and developments which may result in significant changes in population density," by "[r]egulating the use of land on the basis of the impact thereof on the community or surrounding areas," and by "[o]therwise planning for and regulating the use of land so as to provide planned and orderly use of land and protection of the environment in a manner consistent with constitutional rights." §§ 29–20–104(1)(e), –104(1)(g), –104(1)(h), 12A C.R.S. (1986).

In regulating the use of land within their jurisdictions, local governments have several tools at their disposal, including master plans, zoning regulations, and subdivision regulations. Authority for these forms of regulation predated the Act and was reconfirmed and augmented by the general provisions of the Act. "It is the duty of a county planning commission to make and adopt a master plan for the physical development of the unincorporated territory of the county." § 30–28–106(1), 12A C.R.S. (1986). The plan may include "the general location, character, and extent of . . . housing developments, whether public or private." § 30–28–106(3)(a), 12A C.R.S. (1986). The statutes also provide that planning commissions may develop and boards of county commissioners may adopt zoning plans for all or part of the unincorporated territory within the county. §§ 30–28–111 to –113, 12A C.R.S. (1986).

Zoning plans include such matters as uses of land, building location, and density. § 30–28–111, 12A C.R.S. (1986). Furthermore, "[e]very county planning commission in the state shall develop, propose, and recommend subdivision regulations, and the board of county commissioners shall adopt and enforce subdivision regulations for all land within the unincorporated areas of the county. . . ." § 30–28–133(1), 12A C.R.S. (1996 Supp.). "No subdivision shall be approved . . . [unless] found to meet all sound planning and engineering requirements of the county contained in its subdivision regulations." § 30–28–133, 12B C.R.S. (1986).

Larimer County has adopted a master plan, a zoning resolution, and subdivision regulations, pursuant to the foregoing statutory grants of authority. Windemere Acres satisfies the relevant requirements of the zoning resolution. In oral arguments before this court, counsel for the Board conceded that this court could "assume . . . that the technical aspects of the subdivision . . . in terms of the subdivision regulations, can be met or will be met through further negotiation and further exchange between the developer and planning staff." Therefore, the only issue before this court is whether a board of county commissioners may deny a subdivision application based on noncompliance with master plan provisions that the board adopted as part of the county's subdivision regulation requirements, and we need not address the district court's concern that issues "other" than master plan noncompliance supported the Board's decision to deny the proponents' subdivision application.

### IV.

### A.

This court first considered the nature and effect of master plan provisions in *Theobald v. Board of County Commissioners,* 644 P.2d 942, 949 (Colo.1982). As recounted in *Theobald,* Summit County adopted a master plan that aimed to restrict certain types of development to areas within delineated growth centers.[10] *Id.* at 946–47. Several landown-

---

**10.** The provisions at issue in *Theobald v. Board of County Commissioners* were part of the Summit

County Comprehensive Land Use Code (CLUC), a document that "emerged from the development

ers brought suit, alleging that Summit County's master plan amounted to a zoning measure, and seeking a declaration that Summit County's master plan provisions were invalid for reasons including failure to adopt the master plan in accordance with the statutory requirements governing enactment of zoning measures. *Id.* A district court agreed, and held that the Summit County master plan deprived the landowners of constitutional due process as well. *Id.*

On review, this court reversed the judgment of the district court. *Id.* at 946, 951. We noted that "[c]onceptually, a master plan is a guide to development rather than an instrument to control land use," and described a master plan as a "recommendation of the most desirable use of land" that is "generally held to be advisory only." *Id.* at 948–49; *accord* §§ 30–28–106(2)(b), –106(3)(a), 12A C.R.S. (1986) (describing master plans as "advisory" documents that "show the county or regional planning commission's recommendations for the development of the territory covered by the plan"). We concluded that "[n]othing in our review of this case indicates to us that the CLUC was anything other than a master plan, advisory in effect, for the development of Summit County," *Theobald,* 644 P.2d at 950, and rejected the landowners' claims on ripeness grounds, *id.* at 950–51.

We determined in *Theobald* that the landowners would not be injured by a purely advisory master plan unless Summit County applied the plan as a restrictive limit on development. *Id.* In doing so, we anticipated the issue that this court faces today:

At the time this case was commenced in the trial court, the CLUC had not been applied to any specific property through enactment of zoning or otherwise. The master plan, as such, is not susceptible of this kind of challenge, because the appellees cannot realistically demonstrate that

they have suffered any actual harm as a result of its adoption.

. . . .

In order to have a direct effect on property rights, the master plan must be further implemented through zoning, with proper notice and hearing. At such time as a property owner has applied for and been denied a proposed use for his land under existing zoning or future rezoning based upon the master plan, he may challenge the plan and the denial of his asserted right. However, considered alone, a master plan is merely advisory and does not affect legally protected interests of property owners so as to confer standing to challenge the plan.

*Id.* at 950–51 (internal citations omitted). We stated that only a "legislative body charged with zoning" could "individually apply [ ] broad planning policies to specific property" while affording affected landowners "due process," *id.* at 948–49, including "proper notice and hearing," *id.* at 950.

■ Our concern that a landowner not be subject to a master plan compliance demand without imposition of such a requirement through a legislative mechanism that ensures accountability and citizen comment, however, can be satisfied by either a land use regulation requiring master plan compliance that is duly adopted by a board of county commissioners or a statewide statutory requirement mandating master plan compliance. *Beaver Meadows v. Board of County Comm'rs,* 709 P.2d 928, 936 & n. 6 (Colo.1985). In *Beaver Meadows,* we reviewed the Larimer County Board of County Commissioners' decision to condition approval of a planned unit development (PUD) on requirements that the developer pave a road and provide for adequate emergency medical services. *Id.* at 929–931. We considered the conditions imposed by the Board in view of the County's relevant master plan provisions, *id.* at 933, consistent with

of a master plan by the Summit County Regional Planning Commission." 644 P.2d 942, 946 (Colo.1985). "Since the county had no planning commission, the commissioners adopted the plan sitting as the planning commission." *Id.* at 949 & n. 5.; *see* § 30–28–103, 12A C.R.S. (1986) (authorizing a board of county commissioners in its discretion to act as a planning commission in

counties having populations of 15,000 or less). Considering that the relevant authorities adopted the CLUC as a " 'master plan,' " *id.* at 949 & n. 6 (quoting resolution adopted by Summit County Board of County Commissioners), we will refer to the CLUC as a "master plan" throughout our discussion of *Theobald.*

the statutory requirement that PUD plans be " 'in general conformity with any master plan or comprehensive plan for the county,' " *id.* at 935 (quoting § 24–67–104(1)(f), 10 C.R.S. (1982)); *accord Beaver Meadows,* 709 P.2d at 936 & n. 6, and the County's own master plan compliance requirement as outlined in a Larimer County Planned Unit Development Resolution, *id.* at 936 & n. 6. We noted that a legislatively adopted master plan compliance provision would prevail over the general rule that a master plan is advisory only:

> We recognize that in *Theobald v. Board of County Commissioners,* 644 P.2d 942 (Colo.1982), we held, in the context of a review of a zoning resolution, that a master plan "is only one source of comprehensive planning, and is generally held to be advisory only" and is not necessarily binding upon the zoning discretion of the legislative body. *Id.* at 949. However, in this case, the general assembly, and Larimer County, have *required* that a PUD plan *must be* in general conformity with the county's master plan or comprehensive plan. § 24–67–104(1)(f), 10 C.R.S. (1982); Larimer County Planned Unit Development Regulations, §§ II(F), VI(D)(8).

*Id.* at 936 n. 6 (emphasis in original). Nevertheless, although we determined that the requirements of Larimer County's master plan were applicable in the review of a proposed PUD, we concluded that the statutory and regulatory provisions, including the master plan, "provide insufficient standards and safeguards to ensure that county action in response to a PUD application will be rational and consistent and that judicial review of that action will be available and effective," *id.* at 938 (citing *Cottrell v. City & County of Denver,* 636 P.2d 703, 709 (Colo.1981) (setting forth standards for legislative delegations to administrative agencies)); *accord Beaver Meadows,* 709 P.2d at 936. We reconfirm today the principle that has emerged from our decisions in *Theobald* and *Beaver Meadows* that master plans are purely advisory documents, absent (1) formal inclusion of sufficiently specific master plan provisions in a duly-adopted land use regulation by a board of county commissioners or (2) a statutory directive from the General Assembly that landowners must comply with master plan provisions in pursuing land use development proposals.

■ In this case, the Planning Commission adopted the Larimer County Land Use Plan, which is the master plan for Larimer County. That, in itself, would not allow a county to impose a master plan compliance requirement for land use development proposals. *See Theobald,* 644 P.2d at 948–49. A board of county commissioners appoints county planning commission members, except where the board of county commissioners acts as the county planning commission. § 30–28–103, 12A C.R.S. (1986). The members of a county planning commission are not elected to perform the duties of that commission by the people who live within the affected jurisdiction, *id.,* and county planning commissions can adopt master plans without engaging in any legislative proceedings, §§ 30–28–106 to –109, 12A C.R.S. (1986). A county therefore cannot enforce master plan compliance based solely on the authority of the county planning commission's master plan adoption, when a county planning commission is not a "legislative body" that affords affected landowners "due process," *Theobald,* 644 P.2d at 948–49, including "proper notice and hearing," *id.* at 950.

■ However, in adopting Larimer County's subdivision regulations, the Board included a master plan compliance requirement. The foreword to the subdivision regulations calls for consideration of the county's master plan provisions. Sections 3.3(A)(3), 3.3(B)(1)(a), 3.3(B)(2), 3.3(C)(3)(c) and 3.3(C)(4)(c) of Larimer County's subdivision regulations require that master plan provisions serve as "guidelines" for development proposals. For example, section 3.3(C)(4)(c) of the subdivision regulations mandates that "[t]he Board of County Commissioners shall use the Master Plan as a guideline in the evaluation of each development proposal." Furthermore, according to section 3.4 of the subdivision regulations, the purpose of the preliminary plat stage is to review a proposed subdivision in terms of the provisions of the master plan and other specified criteria. The subdivision regulations caution prospective subdivi-

sion applicants in section 4.1(A) that "[i]n designing and planning subdivisions, consideration should be given to the Larimer County Comprehensive Plan...."[11] These references in Larimer County's subdivision regulations constitute a legislative basis for the County's evaluation of subdivision proposals for compliance with master plan provisions. *See Beaver Meadows,* 709 P.2d at 936 & n. 6. An elected board of county commissioners can adopt county subdivision regulations only pursuant to legislative procedural norms,[12] to ensure that those who are affected by the proposed regulations are given notice and have an opportunity for hearing. § 30–28–133(1), 12A C.R.S. (1996 Supp.) ("Before finally adopting any subdivision regulations, the board of county commissioners shall hold a public hearing thereon, and at least fourteen days notice of the time and place of such hearing shall be given by at least one publication in a newspaper of general circulation in the county.").

The Colorado Court of Appeals considered facts similar to those in the present case in *Vick v. Board of County Commissioners of Larimer County,* 689 P.2d 699 (Colo.App. 1984). In *Vick,* the Larimer County Board of County Commissioners denied a subdivision application because it allegedly did not comply with the applicable master plan. *Id.* at 700. On certiorari review, the district court affirmed. As in the present case, the Board had adopted a master plan compliance provision as part of the county's subdivision regulations. *Id.* The court of appeals reversed the Board's denial of the application. *Id.* at 703. The court stated that the county could not utilize a master plan to control land use development proposals, even where the county included a master plan compliance provision in its subdivision regulations. *Id.* at 702–03. The court, however, went on to analyze the three specific grounds for the Board's denial of the subdivision application, all three of which were master plan provisions. *Id.* at 701–02. If indeed the holding of *Vick* is that a master plan is an inappropriate basis for a county's denial of a subdivision application whether or not the county has adopted a master plan compliance provision as part of its subdivision regulations, it was unnecessary for the court of appeals in *Vick* to engage in a substantive analysis of the three master plan grounds for denial. We disapprove *Vick* to the extent that it is inconsistent with our opinion today.

## B.

▮ Our analysis does not end with a determination that a county may enforce a master plan compliance provision that the board of county commissioners legislatively adopted as part of the county's subdivision regulations.[13] A county cannot enforce its

11. The Larimer County Subdivision Regulations address the applicable procedure in the event of conflict between the County's subdivision regulations and the County's master plan:

> Whenever a provision of this [Subdivision] Resolution or the Master Plan conflicts or is inconsistent with any other provision of State law, ordinance, resolution, rule or regulation of any kind by any governmental authority, or covers the same subject matter, whichever provision is more restrictive or imposes the higher standards or requirements, shall govern.
>
> § 3.3(B)(1)(d).

12. In oral arguments before this court, counsel for the proponents agreed that if the Board had copied specific language or provisions out of the master plan into the subdivision regulations instead of simply including a broad master plan compliance provision in the regulations, the Board then would have had the authority to demand compliance with those specifically incorporated master plan provisions. This suggests that the proponents' concern is with specificity, not with the general appropriateness of incorporating master plan concepts into subdivision regulations. We address the specificity issue in part IV(B), *infra* pp. 20–28.

13. The proponents argue that zoning is the exclusive manner for regulating density and that the legislature did not authorize the incorporation of master plan provisions relating to density into subdivision regulations. We believe such a limitation would elevate form over substance. Both zoning plans and subdivision regulations are adopted by boards of county commissioners through a legislative process including notice and public hearing. § 30–28–112, 12A C.R.S. (1986) (zoning); §§ 30–28–133(1), –133(2), 12A C.R.S. (1986 & 1996 Supp.) (subdivision regulation). Although the legislature has statutorily indicated that "density and distribution of population" is a subject for zoning, information required of developers in the subdivision process, such as topography, and geologic and soil characteristics, also implicates population density. Especially in view of the fact that counties are

subdivision regulations, including any master plan compliance provision incorporated into subdivision regulations, simply because a legislative body adopted the regulations consistent with procedural safeguards including notice and hearing. In addition, the provisions that the county seeks to enforce must be sufficiently specific "to ensure that any action taken by a county in response to a land use proposal' will be rational and consistent and that judicial review of that action will be available and effective," *Beaver Meadows,* 709 P.2d at 936 (citing *Cottrell,* 636 P.2d at 709); *accord Beaver Meadows,* 709 P.2d at 938; *Tri–State Generation v. City of Thornton,* 647 P.2d 670, 678 (Colo.1982), and "to provide all users and potential users of land with notice of the particular standards and requirements imposed by the county" for approval, *Beaver Meadows,* 709 P.2d at 936. *Accord* § 30–28–133.5, 12A C.R.S. (1996 Supp.) ("The process for review and approval of any plat or other plan ... shall be conducted pursuant to duly adopted county resolutions, ordinances, or regulations that are available to the applicant prior to commencement of such process," and "[t]he denial of a plat, plan, or agreement shall be supported by written findings specifying the provisions that the plat, plan, or agreement failed to address or satisfy."). In holding legislative bodies to this additional standard, courts "protect against unnecessary and uncontrolled exercise of discretionary power." *Cottrell,* 636 P.2d at 709.[14]

Still, the specificity requirement, "properly applied, does not undercut a desirable degree of flexibility." *Tri–State,* 647 P.2d at 678. In this vein, we have approved broad criteria such as "[c]ompatability with the surrounding

area" and "[h]armony with the character of the neighborhood" when applied in conjunction with more specific criteria relating to utilities and traffic. *Id.* at 678–79 (standards for evaluating planned unit development application); *accord, e.g., C & M Sand & Gravel v. Board of County Comm'rs,* 673 P.2d 1013, 1018 (Colo.App.1983) (standards for evaluating special use permit).

The Board in this case rejected the proponents' subdivision application based on noncompliance with the provisions in the master plan. In its written findings and resolution concerning the subdivision application, the Board specifically outlined the basis in the master plan for its denial:

> The proposed preliminary plat is not consistent with the Larimer County Land Use Plan in location of the proposed use, intensity of use, design, consolidation of services, and maintenance of rural character. Rural areas are designated in the Land Use Plan to "... provide protection for agricultural uses and other low intensity uses requiring large land areas and low service needs. These uses often conflict with subdivisions and other more intensive uses. All uses should be related to agriculture or other uses requiring large land areas, and should be low intensity uses which do not require urban land services ..." (Land Use Plan, 1988, pg. 35).

> Special Planning Guidelines for rural areas state: "Rural areas ... should be encouraged to retain their existing character and open nature. Development in rural areas should be related to and/or compatible with ranching, livestock production, farming and agricultural business activity. Residential development should be clus-

---

not required to adopt zoning plans, § 30–28–111, 12A C.R.S. (1986), whereas adoption of subdivision regulations is mandatory, § 30–28–133, 12A C.R.S. (1986 & 1996 Supp.), we are persuaded that a county is authorized under the broad powers recognized and augmented by the Local Government Land Use Control Enabling Act of 1974, §§ 29–20–101 to –107, 12A C.R.S. (1986 & 1996 Supp.), to incorporate master plan density provisions into subdivision regulations subject to the requirements for adoption and specificity set forth in this opinion.

**14.** The County recognizes the role that sufficiently exact standards play in ensuring both consis-

tent decision-making on the County's part and a basis for judicial review. Accordingly, the County's subdivision regulations require the Planning Commission to detail the basis for its ultimate evaluation:

> After making its evaluation, the Planning Commission shall make written findings relative to the applicable portions of all adopted elements of the County Master Plan and other criteria considered by the Planning Commission.

§ 3.3(c)(3)(e). The Board of County Commissioners is then authorized to adopt or amend the findings of the Planning Commission. § 3.3(C)(4)(e).

tered in a manner that consolidates services and maintains large blocks of open space." (Land Use Plan, pp. 39–40). This proposal contains only about 10% common open space, and is not clustered.

Larimer County Board of Commissioners, "Findings and Resolution: Preliminary Plat for Windemere Acres Subdivision" at 2 (Oct. 13, 1993). The Board's "major issue[ ] and concern[ ]" was that the Subdivision proposal did not comply with the County's master plan:

> The project is located in a rural agricultural area of Larimer County. The proposed subdivision appears suburban rather than rural in character. The Larimer County Land Use Plan guidelines for rural development emphasize low-intensity design that consolidates services and maintains large blocks of open space. Despite the reduced number of lots, only about 10% of the proposal is common open space. Planned Unit Developments, for example, require a minimum of 30% open space.

> The Land Use Plan states that because of lack of services, rural areas are generally inappropriate for subdivision activity.

*See* Larimer County Board of County Commissioners, "Proceedings of the Board of County Commissioners: Monday, August 23, 1993" at 5 (Aug. 23, 1993) (adopting findings and recommendations of Larimer County planning staff). The County maintains that the master plan provisions that it relied upon in denying the proponents' subdivision application were drafted with sufficient exactitude to provide a basis for consistent decisionmaking by the Board and for reasoned judicial review of the Board's ultimate decision.

The Board accurately summarized the applicable County master plan provisions in denying the proponents' subdivision application. The County's master plan considered a "basic element[ ]" of rural residential plans to be a density of ten or more acres per unit. The plan warns that "[d]emand will continue for non-urban residential development," and provides that all such "[l]ow-density residential uses" must be developed so that they "will not conflict with existing agricultural uses." The plan specifically addresses potential density changes in rural areas, specifying that areas designated rural "provide protection for agricultural uses and other low intensity uses requiring large land areas and low service needs. These uses often conflict with subdivisions and other more intensive uses." Addressing the "[i]ntensity of [d]evelopment" in rural areas, the master plan requires that "[a]ll uses should be related to agriculture or other uses requiring large land areas, and should be low-intensity uses which do not require urban-level services (such as Minor Residential Developments)." As "special planning guidelines," the plan envisions that rural areas "should be encouraged to retain their existing character and open nature." In particular, "[d]evelopment in rural areas should be related to and/or compatible with ranching, livestock production, farming and agricultural business activity. Residential development should be clustered in a manner that consolidates services and maintains large blocks of open space." Again, as part of the "special planning guidelines" relating to "agriculture and rural development," the master plan reiterates that "[b]ecause of the potential conflicts with existing uses and the lack of services, rural areas are generally inappropriate for subdivision activity." [15]

---

**15.** The proponents attempted to offer evidence that the Subdivision would be compatible with existing agricultural uses in the area. However, the evidence presented by the proponents instead supported the proposition that the area in question would be better suited for residential development. In a petition presented to the Board, area landowners aspired to a change in the character of their land from rural to residential:

> We, the undersigned, are all farmers who farm in the area of Windemere subdivision. The development of the subdivision is *not* inconsistent or in conflict with our agricultural use of our land. Most of the land in this area

is marginal, at best, for farming. None of it could be classified as prime agricultural land. The Soil Conservation Service has classified this land as very poor to fair, which is a low production classification.

. . . .

> We welcome an opportunity for this development, and others. This would, hopefully, give us relief from a marginal economic existence, from increased taxes, and static agricultural returns.

(Emphasis in original.) At the hearing before the Board, one of the farmers who signed the petition reiterated that "[t]he development of the subdivision, we felt, is not inconsistent or in conflict with the agricultural use of our land"

We do not address whether these foregoing master plan provisions are drafted with sufficient exactitude "to ensure that any action taken by a county in response to a land use proposal will be rational and consistent and that judicial review of that action will be available and effective." *Beaver Meadows,* 709 P.2d at 936 (citing *Cottrell,* 636 P.2d at 708–09); *accord id.* at 938 (same); *Tri–State,* 647 P.2d at 678. The district court addressed this due process concern in issuing its ruling:

It is also asserted that the plan lacks adequate and necessary standards and specificity to meet appropriate constitutional requirements, lacks objective standards, is overbroad, and is vague. Plaintiffs have the burden of establishing this assertion beyond a reasonable doubt. The comprehensive land use plan uses terms such as harmony, compatibility, need, and so forth, which are within the ordinary understanding of reasonable people, and which have been approved on appellate review, in the context of a constitutional challenge, in similar circumstances. A person of ordinary intelligence is not required to guess or speculate as to the meaning of these terms. The plan appears to the Court to contain sufficient standards that all parties will be apprised of their respective rights, and a sufficient bench mark exists for measuring administrative action in case of subsequent judicial review. The Court does not believe that plaintiffs have overcome the presumption of validity and constitutionality with regard to the plan, or the use of the plan in this case.

(Citations omitted.) However, the district court never referenced the specific master plan provisions that the Board relied upon in denying the subdivision application, and the court therefore did not consider explicitly each applicable master plan provision pursuant to due process standards relating to specificity. For this reason, we remand to the district court for the entry of more detailed findings pursuant to C.R.C.P. 106(a)(4)(IX).[16] In the event that the district court is unable to ascertain the exact basis in the master plan for the Board's denial of the subdivision application, it is appropriate for the court to remand the case to the Board pursuant to C.R.C.P. 106(a)(4)(IX), *supra* note 16, "to make findings of fact or conclusions of law necessary for a review of its action." [17]

## V.

We hold that although master plans are generally only advisory documents, a county has the authority to require master plan

---

because "we [area farmers] welcome an opportunity for this development, and others, and this would hopefully give us relief from the production that we have off of this land." Larimer County Board of Commissioners, "Public Hearing Before the Larimer County Commissioners: Concerning an Application for Subdivision Approval [of] Windemere Acres Subdivision" at 27 (Aug. 23, 1993). Another farmer testified in a similar vein:

Well, the rural atmosphere can be kept with the way they have this designed and since I do farm adjacent I know what that land is like. It is not the best farmland and when opportunity presents itself for us to move to different farmland then that is in a way the continuing agriculture because I don't plan to quit, I just plan to move.

So this land we are talking about right here may— this subdivision may have a leapfrog affect [sic] on it but I guess that's the destiny of this land.

*Id.* at 33. Another area resident testified that the "leapfrog" effect of the Subdivision would destroy, rather than preserve, the existing rural nature of the area in question. *Id.* at 30–31.

16. C.R.C.P. 106(a)(4)(IX) provides:

In the event the court determines that the governmental body, officer or judicial body has failed to make findings of fact or conclusions of law necessary for a review of its action, the court may remand for the making of such findings of fact or conclusions of law.

17. Alternatively, if the district court determines that the master plan provisions relied upon by the Board are insufficiently specific, the court may still remand the case to the Board with directions (1) that before the Board may condition approval of the subdivision application on compliance with the same master plan provisions, the Board first must amend the master plan to include sufficiently exact standards or issue proper subdivision regulations or zoning standards implementing the relevant master plan provisions, and (2) that the Board must afford the Subdivision proponents and any other interested parties the opportunity to present additional evidence relating to any new regulatory criteria. *See, e.g., Beaver Meadows v. Board of County Comm'rs,* 709 P.2d 928, 939 (Colo.1985).

compliance when a county includes a master plan compliance provision in its legislatively adopted subdivision regulations. However, in requiring master plan compliance, the master plan provisions at issue must be drafted with sufficient exactitude so that proponents of new development are afforded due process, the county does not retain unfettered discretion, and the basis for the county's decision is clear for purposes of reasoned judicial review. Accordingly, we reverse the judgment of the court of appeals and remand to that court with the direction to remand the case to the district court for additional proceedings consistent with this opinion.

KOURLIS, J., dissents, and HOBBS, J., joins in the dissent.

Justice KOURLIS, dissenting:

The proponents' property was zoned FA–1, which is a farming district residential zone with minimum lot size requirements of 100,-000 square feet or approximately 2.30 acres. Maj. op. at 1341. Under the Larimer County Land Use Plan (the master plan), the proponents' property was included in a rural area. The master plan specifies that rural uses "should be related to agriculture or other uses requiring large land areas...." The proponents' subdivision application initially contemplated lot sizes of 3 acres per unit. Later, proponents' amended their application to include surrounding 35 acre tracts and thereby increase the average lot size to 10 acres. The use sought by the proponents was in compliance with the applicable zoning on the property. However, it did not comport with the master plan.

In my view, the proponents' property was inappropriately down-zoned by virtue of the master plan. Further, the subdivision regulations only refer to the master plan as a guideline, and the standards set out in the master plan governing a proposed subdivision in a rural area are insufficiently specific.

For those reasons, I do not believe that the county could deny the proponents' subdivision application on the basis of noncompliance with the master plan, and I therefore respectfully dissent. I would affirm the court of appeals result in *Condor v. Board of County Comm'rs of Larimer County*, No. 94CA0848 (Colo.App. May 4, 1995), although differing in my rationale for that outcome.

I.

Land use regulation represents an uneasy compromise between private landowner rights and community interests. The power to plan for and regulate the use of land is an outgrowth of the police powers afforded to local governments by the state in order to promote the public health, safety and welfare and to encourage and facilitate orderly growth. *King's Mill Homeowners Ass'n, Inc. v. City of Westminster,* 192 Colo. 305, 557 P.2d 1186 (1976).

There is a distinction between planning for the use of land and regulating that use, as we recognized in *Theobald v. Board of County Comm'rs,* 644 P.2d 942, 948 (1982). *See also* §§ 30–28–101 to –137, 12A C.R.S. (1986 & 1996 Supp.). Master plans are the broadest exercise of the planning function delegated to local governments. They are initially adopted by county planning commissions[1] in order to "accomplish the harmonious development of the county in terms of the general welfare of the inhabitants and the efficient and economic use of its land." *Johnson v. Board of County Comm'rs,* 34 Colo.App. 14, 18, 523 P.2d 159, 161 (1974), *aff'd sub nom. Colorado Leisure Prods. Inc. v. Johnson,* 187 Colo. 443, 532 P.2d 742 (1975). The master plan must include all of the unincorporated territory of the county and is necessarily and definitionally sweeping in scope. As we held in *Theobald,* the master plan is the "planning commission's recommendation of the most desirable use of land. Conceptually, a master plan is *a guide to development* rather than an instrument to control land use." *Theobald,* 644 P.2d at 942 (emphasis added) (citations omitted).

The actual regulation of land use, on the other hand, is accomplished first through zoning and second through subdivision regulations with regard to the design of the subdivision and the platting of individual lots therein. Zoning, unlike a master plan, is not

---

1. § 30–28–106, 12A C.R.S. (1986).

merely a guide to development but is instead the direct implementation of land use controls. The effect of zoning is to delineate the permissible and impermissible uses of specific parcels of property. A landowner may not choose to use the property in a way that conflicts with the applicable zoning. On the other hand, when the zoning approval is in place, the landowner, absent a legal downzoning, cannot be refused the right to make authorized use of the property.

Because it is merely a guideline, a master plan in and of itself can have no direct effect on land use unless it is adopted through proper means. This court has previously recognized two means by which the master plan may become enforceable. First, in *Theobald* we stated that "[i]n order to have a direct effect on property rights, the master plan must be further implemented through zoning, with proper notice and hearing." *Id.* at 950. After *Theobald,* we decided *Beaver Meadows v. Board of County Commissioners,* 709 P.2d 928 (Colo.1985). In *Beaver Meadows,* we recognized that provisions of a master plan adopted in a Planned Unit Development (PUD) plan are enforceable because the general assembly "*required* that a PUD plan *must be* in general conformity with the county's master plan or comprehensive plan." *Id.* at 936 n. 6 (emphasis in original) (citing § 24–67–104(1)(f), 10 C.R.S. (1982)).[2]

It is my view of the teachings of our cases and of statutory enactments that a master plan can be enforced as a land use regulation only if: 1) the general assembly acts, as it has in the area of PUDs, to permit incorporation of master plans into certain land use regulations; or 2) the board of county commissioners acts, in compliance with all due process requirements, to incorporate the plan into the zoning ordinances. Absent such actions, a master plan is an advisory document that cannot serve as the basis for denial of a subdivision application.

## II.

The question before the court in this case is whether the board of county commissioners may deny proponents' subdivision application based solely on noncompliance with master plan provisions that the board adopted as part of the county's subdivision regulation requirements. Maj. op. at page 1344. In light of the applicable authority, I answer that question in the negative.

The majority concludes that to require the master plan to be adopted through zoning ordinances rather than through subdivision regulations would elevate form over substance. Maj. op. at 1347 n. 13. I disagree. First, it is my view that zoning restrictions and subdivision regulations are separate tools with distinct purposes. Zoning ordinances regulate the use of specific plots of land, whereas subdivision regulations set the standards for county approval of a proposed subdivision plat. § 30–128–133, 12A C.R.S. (1996 Supp.). Zoning is limiting and preclusive as to authorized uses; subdivision regulations are general and inclusive and are designed to govern the layout and platting of the subdivision. In law schools, property rights are envisioned as a bundle of sticks. Zoning deprives the landowner of some of the sticks in that bundle by reducing the uses to which the land may be devoted. Subdivision regulations, in contrast, do not diminish the bundle of sticks. They merely impose standards that must be followed if the landowner wishes to take advantage of one aspect of ownership by creating individual lots that can be developed and sold.

Subdivision regulations are applicable when a landowner attempts to divide his or her land into multiple individual lots. Subdivision regulations are

> intended to protect the community from the creation and development of poorly designed and ill-equipped neighborhoods. These regulations commonly imposed standards for the subdivision of land which required that new streets be efficiently constructed and logically related to the

---

**2.** However, we found in *Beaver Meadows* that the regulations inherent in the applicable comprehensive plan set forth standards and safeguards that were insufficient to ensure that county action in response to a PUD application would be rational and consistent and that judicial review of that action would be available and effective. *Beaver Meadows,* 709 P.2d at 938.

existing street system. They required that the newly developed land be provided with basic services essential to modern living, and that the municipality be protected from the financial impact of initial installation costs. And they required that subdivisions be consistent with the zoning regulations of the community.

Robert M. Anderson, *American Law of Zoning* § 1.15 (3d ed.1986). Thus, a person who wishes to subdivide his or her land must first look to the applicable zoning ordinance to see if such density and use is permitted and, if so, then meet the requirements imposed by the subdivision regulations.

Presumably because of that difference, the courts and the general assembly generally require more stringent due process when a governmental entity is enacting or amending zoning regulations than when it is adopting subdivision regulations. To enact or amend a zoning regulation, the board of county commissioners must hold a public hearing and give at least fourteen days notice in a newspaper of general circulation in the county. §§ 30–28–112 and 116, 12A C.R.S. (1996 Supp.). The notice must state the place where the full text of the proposal may be examined. *Id.* In addition, the notice must state the place where a map of the proposal may be viewed. *Id.* This requirement enables the public to readily discover the exact location of the legal description contained in the public notice.

Strict compliance with notice requirements for zoning is mandatory. The legislative intent in enacting the zoning statute is that "overall plans or changes should be given such publicity as will reasonably inform those owners affected, as well as the public, of what is proposed." *Holly Dev. Inc. v. Board of County Comm'rs,* 140 Colo. 95, 105, 342 P.2d 1032, 1038 (1959). The purpose of such publicity is to give fair warning to such persons so that they may appear at the public hearing and have an opportunity to be heard. *Sundance Hills Homeowners Ass'n v. Board of County Comm'rs,* 188 Colo. 321, 325, 534

P.2d 1212, 1214 (1975). The meaning of the notice must be intelligible to the layman and any ambiguity is to be resolved in favor of the public. *Holly,* 140 Colo. at 101, 342 P.2d at 1036; *Hallmark Builders and Realty v. City of Gunnison,* 650 P.2d 556, 560 (Colo. 1982).

In contrast, a county's adoption of subdivision regulations has never been as strictly circumscribed, either by statute or by case law. While adoption of subdivision regulations does require a public hearing and fourteen days notice in a newspaper, the notice does not need to explain where the exact text may be examined. § 30–28–133, 12A C.R.S. (1996 Supp.). Instead, all that is required is for a copy of the proposed regulations to be filed with the county clerk and recorder of the county. *Id.* In addition, there is no requirement that a map plotting out the proposed changes be available for public inspection. Furthermore, there is no case law emphasizing an imperative need to ensure that the public is apprised of the proposed changes.

If a landowner is to be precluded from subdividing land on which the zoning would otherwise permit such a use, I view the adoption of subdivision regulations as an inappropriate means of accomplishing that end. That landowner would not have any reason to be on notice that his or her land was being effectively down-zoned through the adoption of the regulations. If the county wishes to achieve that down-zoning, it should do so by specific amendment of the zoning ordinances.[3]

For instance, Larimer County would have the authority to create a special category of zoning labeled "Rural Residential" in which lot sizes would be required to be larger than in other areas zoned Residential. Such a procedure would preserve the benefits of regulating growth and development in accordance with a general plan, while still protecting the landowner. Under that hypothetical,

3. I do note that zoning is not required in this state, whereas every county must adopt subdivision regulations. If there are counties in Colorado with master plans and without zoning, I would continue to view any attempt by those counties to implement the master plan through subdivision regulations as inappropriate. Uses should not be precluded except through a zoning resolution.

the zoning on the rural landowners' property would be changed and the notice provisions associated with amendatory zoning would be invoked. Further, the landowner would be assured that a subdivision application would be reviewed under consistent, specific standards applicable to all similarly zoned property.

The majority suggests that the master plan provisions adopted by the subdivision regulations would be enforceable as to the landowners in this case only if drafted with sufficient exactitude to ensure that any action taken by the county will be rational and consistent and that judicial review of that action will be available and effective. Maj. op. at 1350. The majority remands this case for a determination of whether the necessary exactitude is present.

I share the majority's factual concern, but it leads me to a different legal conclusion. Zoning requires a higher degree of notice and specificity than the subdivision regulation adoption process. Neither the notice relating to prospective adoption of the subdivision regulations nor the ultimate language incorporated into the subdivision regulation is required to be "sufficiently detailed to provide all users and potential users of land with notice...." *Beaver Meadows*, 709 P.2d at 936. I would therefore conclude that subdivision regulations, which merely reference a master plan as a guideline, inherently provide inadequate due process protection because authorized uses of land under the applicable zoning resolution may be precluded. Subdivision regulations are an inappropriate vehicle by which to impose constraints on land use; rather their function is to control subdivision design. A master plan can guide the development of subdivision regulations, but cannot control review of a subdivision application.

### III.

Further, in my view, Larimer County did not, in fact, adopt the master plan into its subdivision regulations. Compliance with the master plan is not made a specific condition of approval of a subdivision application. Rather, the regulations refer to the master plan as providing guidance. For example,

they state that the intent is "[t]o assure that the Master Plan is used as a guideline in all proposals for development," R. at v. VIII, p. 21, and that the Board of County Commissioners is instructed to "use the Master Plan as a guideline in the evaluation of each development proposal." R. at v. VIII, p. 24. Moreover, the regulations merely state that "consideration should be given to the Larimer County Comprehensive Plan" (also called the Master Plan, R. at v. VIII, p. 21) in designing and planning subdivisions, R. at v. VIII, p. 47; they do not mandate compliance with the master plan.

Additionally, the master plan itself does not specify the lot size required for subdivisions in rural areas. Rather, the language of the master plan may be read to infer that subdivisions will not be approved at all in the rural areas of the county. The lack of specificity in the master plan provides insufficient notice to landowners and invites inconsistent application.

Therefore, under the terms of the regulations themselves, I do not believe that the board may deny the proponents' subdivision application based solely on noncompliance with the master plan. The regulations refer to the master plan as an advisory, not a mandatory, document and the master plan itself is lacking in specificity.

### IV.

A master plan is just what it claims to be—a planning tool. Absent legislative directive similar to the PUD statutes, I do not believe such a plan can be converted into a land use regulatory constraint unless specifically adopted through zoning resolutions with all the procedural safeguards inherent in that process.

Hence, I respectfully dissent from the majority opinion. I would agree with the court of appeals in overturning the Board of County Commissioner's denial of the subdivision application.

I am authorized to say that Justice HOBBS joins in this dissent.